Lisa J. Rodriguez (lisa@trrlaw.com)
Trujillo Rodriquez & Richards LLC
258 Kings Highway West
Haddonfield, NJ 08033
T: 856-795-9002
F: 856-795-9887

Attorneys for Plaintiffs
(*Additional Counsel on Signature Page*)

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARK MANISCALCO and WALTER HURYK, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>BROTHER INTERNATIONAL (USA) CORPORATION,<br><br>Defendant. | No. 3:06-cv-04907-FLW-TJB<br><br>**CLASS ACTION**<br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Mark Maniscalco and Walter Huryk, individually and on behalf of the Class defined below, bring this action for damages and equitable relief against Defendant, Brother International (USA) Corporation ("BIC"), demanding a trial by jury, and complain and allege as follows:

## INTRODUCTION

1.      BIC markets, advertises, and distributes Brother® brand inkjet Multi-Function Center line of all-in-one devices, which are designed for printing, sending and receiving faxes, scanning, and copying for personal use or for use in small businesses or home offices (collectively, "MFC machines").  BIC also contributes to the design of the MFC machines, which are manufactured by its parent company, Brother Industries Ltd ("BIL").   Additionally, BIC markets, advertises and distributes for sale replacement Original Equipment Manufacture ("OEM") ink cartridges used by MFC machines.

2.      Plaintiffs are informed and believe that BIC's profit margins on replacement OEM ink sales are huge, and that the profits BIC earns on the sale of ink eclipse the profits BIC earns on the sale of MFC machines.[1]

3.      Inkjet cartridges manufactured by third parties ("non-OEM cartridges") are often substantially less expensive than those manufactured and

---

[1] Plaintiffs are informed and believe that brand-name printer ink is one of the most costly liquids there is — ounce for ounce, it is far more expensive than Dom Perignon champagne, or Chanel No. 5 perfume — and it comprises a substantial portion of printer manufacturers' profits.  *See, e.g.,* Peter Burrows, "Ever Wonder Why Printer Ink Costs So Much?," *BusinessWeek* (Nov. 23, 2005) (discussing reasons that printer manufacturers have sought to quell competitive threat posed by the manufacture and sale of non-OEM cartridges) (available online at http://www.businessweek.com/magazine/content/05_46/b3959058.htm).

**THIRD AMENDED COMPLAINT**
No. 3:06-cv-04907

sold by BIC, and as BIC has recognized in its internal documents, BIC has no basis for asserting that the use of non-OEM ink harms MFC machines' print heads.

4.    As demonstrated by internal documents BIC has produced in discovery, BIC has created an artificially high demand for its own (OEM) inkjet cartridges by engaging in deceptive conduct that has harmed — and continues to harm — consumers.

5.    First, MFC machines are designed to falsely display the message "Ink Empty" — even though a substantial quantity of ink remains in the ink cartridge — and to cease printing, copying, and faxing until each purportedly "empty" cartridge is replaced.  BIC intentionally conceals, from consumers, that the "Ink Empty" message is false, and that the ink cartridges in their MFC machines still contain useable ink in them even though the machines say that the cartridges are empty. Nor does BIC disclose, to prospective purchasers, that MFC machines are designed to disable all functionality when the false "Ink Empty" message is displayed until the still-useable cartridges are removed and replaced with new ones.

6.    Second, MFC machines are intentionally designed to accelerate the depletion of ink in two ways:  (a) by implementing a "self-cleaning" feature that uses so much ink that it will deplete cartridges *even if the machine is not used*; and (b) by setting the machines' default settings to use color ink even if the user seeks to print exclusively in black (*e.g.,* text or black-and-white images).  In addition, BIC internal documents reveal that defects in certain series of MFC machines caused them to deplete *even more* ink — regardless of the manner in which the machines

were used. BIC has intentionally concealed this information from prospective purchasers.

7.    In addition to deceptively creating a higher demand for OEM ink cartridges, BIC has intentionally concealed from consumers information about the existence of a print head defect in MFC machines. More specifically, BIC internal documents reveal that in 2001, BIC became aware of a defect that causes the print heads in MFC machines to fail well before their expected useful life of at least five years or 50,000 pages. Plaintiffs are informed and believe that the defect is referred to as the "ME41 defect" because most model MFC machines display the error code, "Machine Error 41" on their LCD screens when their print heads failed.

8.    BIC internal documents also reveal that, although BIC is aware that the use of non-OEM ink has nothing to do with the ME41 defect, BIC took advantage of the existence of this defect and used it to promote the use of OEM ink by instructing its representatives to mislead customers whose machines stopped functioning as a result of the ME41 defect into believing that the use of non-OEM ink did or can cause that damage.

9.    BIC intentionally concealed the information set forth in paragraphs 5 through 8 from consumers as a means of maximizing its revenues and minimizing losses. As a result, Plaintiffs and the class they propose to represent in this action were forced to pay for ink that they were not able to use, and to bear the cost of repairing or replacing MFC machines that failed due to the ME41 defect.

10.   BIC's conduct constitutes violations of the New Jersey Consumer Fraud Act ("CFA") and has led to BIC's unjust enrichment. Accordingly, Plaintiffs

THIRD AMENDED COMPLAINT
No. 3:06-cv-04907

have brought this action on behalf of themselves and the other purchasers of MFC machines they propose to represent for the purpose of **(a)** obtaining an award of damages for BIC's violations of the CFA and the common law on behalf of each class member who has already suffered a loss in connection with the conduct described herein; (b) obtaining declaratory relief in the form of an order declaring that class members whose print heads have yet to fail have the right to reimbursement of the cost of repair or replacement if and when their print heads fail as a result of the ME41 defect; and **(c)** obtaining an order enjoining BIC from continuing to engage in the unlawful, deceptive and unconscionable conduct described above.

## JURISDICTION AND VENUE

11.     This Court has diversity jurisdiction over the claims asserted herein on behalf of a nationwide class pursuant to 28 U.S.C. § 1332, as amended in February 2005 by the Class Action Fairness Act.  Jurisdiction is proper because (a) the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; (b) there is complete diversity of citizenship between Plaintiffs and Brother; and (c) Brother has purposefully availed itself of the privilege of conducting business activities within the State of New Jersey, where it maintains its principal place of business and from which it distributes and sells the products at issue in this lawsuit to Plaintiffs and to the members of the proposed class.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims asserted herein occurred in this district.

THIRD AMENDED COMPLAINT
No. 3:06-cv-04907

## PARTIES

13.     Plaintiff Mark Maniscalco is a resident of Long Beach, California, who purchased a Brother MFC 3220c all-in-one device for his own use (and not for resale).

14.     Plaintiff Walter Huryk is a resident of North Myrtle Beach, South Carolina, who purchased a Brother 3220c all-in-one device for his own use (not for resale).

15.     Defendant Brother International Corporation (USA), is a corporation that was created under the laws of the state of Delaware, and maintains its principal place of business in Bridgewater, New Jersey.

## GENERAL ALLEGATIONS

16.     As discussed in more detail in the Class Allegations section below, the class Plaintiffs seek to represent in this action comprises all consumers who purchased Brother MFC machines for use, and not resale, in the United States, and all consumers who purchased OEM ink for use in MFC machines from October 2000 to the present.

17.     BIC's MFC Machines utilize a four-cartridge ink system.  In order for MFC machines to print and/or to produce copies, each of their four ink-cartridge slots must be filled with the correct color ink.  That is, the black ink slot must contain a black ink cartridge, and the color-ink slots must each contain the appropriate color ink cartridge.

18.     In its marketing materials, BIC touts its four-cartridge ink system as a "cost-saving 4-cartridge system" that allows the user to "only replace the color that's

**THIRD AMENDED COMPLAINT**
No. 3:06-cv-04907

empty!"  BIC also claims the 4-cartridge system results in "low running costs."
Indeed, to this day, BIC makes the following statement on its website:

> All of the Brother color inkjet MFCs utilize a 4-cartridge system,
> **which is the most efficient way to minimize ink waste**. Brother's
> design means that you only replace ink cartridges **that are really
> empty**.  [Emphasis added.][2]

19.    The clear implication of this "feature" is that consumers will save
money by not having to replace ink that they do not use.  As senior BIC personnel
have discussed internally, however, that is not true.  For example, in a February
2005 e-mail exchange regarding the way in which BIC handles ME41 warranty
issues in the United States, the Vice President of BIC's National Service Division,
Charles Stadler, conceded, internally, that

> [w]e have a statement that we use to try to convince consumers that
> the Brother ink jet technology is actually less expensive than other
> manufacturers, **which is very difficult to do considering the ME41
> issue and the fact that the print head is not user
> replaceable**. . . .
>
> A positive aspect of the Brother ink jet machines is that Brother
> designed the products with an ink jet technology that saves the
> consumers money.  Brother manufacturers the print head and ink
> cartridges as separate consumables.  With Brother's print head and
> ink cartridge technology, you replace only the ink cartridge when ink
> replacement is required, thus reducing your cost of the replacement
> ink cartridges and the cost per page.   [Emphasis supplied.]

20.    Plaintiffs are also informed and believe that BIC has used a number of
deceptive ploys to ensure class members purchase OEM ink, rather than purchase
non-OEM ink from one of Brother's competitors.  For example, in some of its

---

[2] http://www.brotherusa.com/mfc/LearningCenter/default.aspx?PageName=mfc-whybuy.html

**THIRD AMENDED COMPLAINT**
No. 3:06-cv-04907

warranty manuals, BIC has warned consumers that if they do not purchase replacement ink cartridges from Brother, the warranty on their MFC machines would be void — in flagrant violation of federal law. *See* 15 U.S.C. § 2302(c); 16 C.F.R. § 700.10(c).

21.    Although BIC eventually ceased such overtly unlawful conduct in connection with the text of its warranties, BIC has continued to discourage the use of non-OEM cartridges by, *inter alia*, falsely advising consumers that (i)  non-OEM cartridges are inferior to those that BIC sells, even though Plaintiffs are informed and believe BIC has no credible evidence to support that assertion; (ii) using OEM ink will "ensure the reliable operation and protection" of BIC's defective print heads (which BIC falsely describes, in its ads, as having a "long life"); and (iii)  using non-OEM cartridges will damage their MFC machines, even though Plaintiffs are informed and believe that BIC has no credible evidence to support that assertion.

22.    Plaintiffs are also informed and believe that BIC has advised its representatives to falsely advise consumers who call with questions about the Error 41 Defect that the use of non-OEM ink can or did cause their problems, even though BIC is aware that the use of non-OEM ink has no casual relationship to the Error 41 defect.

I.    THE METHODS BY WHICH MFC MACHINES WASTE INK

- ***Designing All MFC Machines to Display False Ink-Empty Messages***

THIRD AMENDED COMPLAINT
No. 3:06-cv-04907

23.    BIC's MFC machines are designed so that they falsely advise class members that their ink cartridges are empty, when those cartridges actually still have substantial amounts of usable ink left in them.

24.    Plaintiffs are also informed and believe that, once an MFC machine displays the false "ink empty" message, the machine will not function until the ostensibly empty ink cartridge(s) is/are replaced.  Thus, for example, if an MFC machine's yellow ink cartridge is deemed "empty," a class member cannot use the MFC machine to print black text until the yellow ink cartridge is replaced.  As a result of BIC's use of such technology, class members are prevented from using substantial amounts of costly ink that remains in cartridges they purchased, and are forced to purchase new ink cartridges in order to cause their MFC machines to function.

25.    Plaintiffs are informed and believe that the purpose of the deliberately false "ink empty" feature is to require class members to buy OEM ink much more frequently, and to buy more OEM ink than they actually use.

26.    In addition to concealing information about the foregoing design features that cause MFC machines to waste ink, BIC internal documents demonstrate that BIC intentionally conceals information that would enable class members to determine how much ink is actually contained in their inkjet cartridges. For example, in a December 2006 e-mail exchange between BIC, BIL and other subsidiaries, BIL explained that:

> [i]nk volume information is 'confidential' information, then BIL has not released this information yet. . . .  We are afraid that once we release

this information to you (customer), this information will be leaked to all over the world.

- ***The Self-Cleaning "Feature," Which Was Purposefully Designed to Waste Ink, Affects All MFC Machines***

27.    All MFC machines are intentionally designed with a self-cleaning "feature," which causes them to purge ink from each of the four ink cartridges on a regular and frequent basis.  As a result of this design feature, Plaintiffs are informed and believe that MFC machines will, *inter alia*, drain each of their four ink cartridges — ***even if the user never prints or copies anything at all***.

28.    Plaintiffs are also informed and believe that, due to the way MFC machines are designed to operate, class members cannot avoid replacing ink cartridges they may never even use, and will replace the ink cartridges they do use more frequently due to the depletion of ink during the self-cleaning process.

29.    Plaintiffs are informed and believe that the self-cleaning feature is intended to cause MFC machines to consume excessive quantities of ink, thereby requiring class members to buy OEM ink much more frequently and to buy more OEM ink than they actually use.

30.    Plaintiffs are informed and believe that, in addition to wasting ink, the self-cleaning process actually can and does trigger the onset of the ME41 defect, which causes the print heads installed in MFC machines to fail permanently.

31.    Plaintiffs are also informed and believe that BIC intentionally has concealed, and continues to conceal, information about MFC machines excessive ink consumption from prospective purchasers, so as not to affect the sales of its MFC

machines.  For example, in an e-mail exchange dated June 2005 regarding the amount of ink consumed by the BHL3 series of MFC machines, BIL admits to BIC Technical Support team member Alan Hillborn that the updated design of the BHL3's self-cleaning feature is one reason the BHL3 series consumes substantially more ink than its predecessors, even though the BHL3 ink cartridges actually have a shorter service life. [3]

32.    BIL warned, however, that this explanation was being provided to "satisfy [Mr. Hillborn's] technical curiosity" and was not to be shared with BIC's customers.  Mr. Hillborn was instructed not to pass along this information to curious customers:

> If you must explain to your real customers regarding ink consumption issue, and you need official comment from BIL, then we — CS department member — are not right people to ask.  We need to consult our PDM department to make official statement.

33.    Again, Plaintiffs are informed and believe that BIC conceals this information from prospective purchasers.

- ***The Color-Default Setting That Affects All MFC Machines***

34.    As a company that has sold printers, copiers, and fax machines for decades, BIC is well aware that the vast majority of class members use MFC

---

[3] MFC machines are referred to within BIC by specific numbers or letters assigned to the various series that comprise the class, such as the BHL3.  Although Plaintiffs are not yet aware of each internal designation for the various series of MFC machines, they are informed and believe that they include the following:  the BH series, the BHL series, the BHL2 series, the BHM series, the BHmini series, the BHmini2 series, the BHmini3 series, the BH3/BHL3 series, and the BH7 series.

machines to copy and print in black (as opposed to color) text.  BIC also knows that, with very few exceptions, faxes are nearly always printed in black.

35.     Yet MFC machines are intentionally designed so that their default setting is color, as opposed to grayscale (*i.e.,* black).  This means MFC machines are designed to draw ink from each of the four ink cartridges to produce black text, rather than simply drawing ink from the single black cartridge, making it more expensive to operate the machine.

36.     Plaintiffs are also informed and believe that MFC machines are intentionally designed so that class members cannot change the settings so that MFC machines default to print, copy or fax in grayscale (*i.e.,* black).

37.     Additionally, Plaintiffs are informed and believe that BIC intentionally conceals information that would enable class members to turn off the color print mode altogether, so that their MFC machines print ***only*** in black.  For example, in a March 2005 e-mail exchange concerning a customer who had complained about having to replace colored ink even though she prints only in black, the Vice President of BIC's National Service Division, Charles Stadler, cautioned customer service not to tell class members how to permanently defeat the color-default setting Brother designed into the MFC machines:

> I also understand that Sean has a way to permanently turn off the color printing.  Marketing has decided not to market a mono printing ink jet model and we should not provide that option to any of our customers.

38.     Plaintiffs are informed and believe that the purpose of the color-default setting is to cause MFC machines to consume excessive quantities of colored ink,

requiring class members to buy color ink much more frequently than they otherwise would.

39.     The print, copy, and fax functions of the MFC Machines are designed to become disabled if even one of its four ink cartridges is missing from its designated slot or is deemed "empty."  Given that MFC machines are also designed to use color ink when the user seeks to print exclusively in black, this design guarantees that the user must purchase color ink, regardless of whether he or she every prints in color at all.  This feature becomes even more costly when coupled with the false-empty design feature and the self-cleaning design feature that are discussed in ßthis Complaint, and the defects discussed below.

- *The Ink-Purge/Ink Empty Defects*

40.     Plaintiffs are informed and believe that the BHL2 line of MFC machines also suffers from two known, related defects, which exacerbate the problems created by the intentional self-cleaning and false-ink-empty design features and cause these MFC machines to waste even more ink than they were originally designed to waste.  Plaintiffs are informed and believe that BIC refers to these defects internally as the "Ink-Purge" issue and the "Ink-Empty" issue.

41.     Plaintiffs are informed and believe that BIC has intentionally concealed the existence of these defects from class members even while conceding (internally) that (a) it is aware that the frequency with which MFC machines waste ink is material information, and (b) that BIC has "an obligation to proactively deal with this issue."  For example, in an internal document dated September 2004,

Charles Stadler, Vice President of the National Service Division at BIC, concedes that

> The BHL2 ink is rather expensive, $20 per cartridge in the USA. Three color ink cartridges are approximately $60!  We also have many web sites selling generic Ink Cartridges for the BHL2 for $5 per cartridge and customers that have found these web sites are using this ink.  ***These customers feel that BIC is 'ripping them off' by over charging for the ink and designing the product to use up the ink through purging and requiring them to keep changing the color ink when they don't use color ink.  We don't have any good explanation for these customers.***  The customers that are using the $5 generic ink are very happy with the performance of that ink and changing the three color ink cartridges cost $15, not $60!  [Emphasis added.]

42.    In another internal BIC document, dated September 2004, Mr. Stadler made clear that BIC understood the importance of this issue to consumers:

> ***As I am sure you are aware, the excess purging of ink with the BHL2 products is a very serious customer satisfaction issue***.  We have received several thousand calls from customers regarding the ink usages and have swapped several hundred customer's product for false ink empty.  Everything that we have advised these consumers thus far and all of the products that we have swapped for ink empty ***have done nothing to resolve these issues***.
>
> ***My understanding is that 100% of all the BHL2 products that have been shipping have 'defective' ROM, causing the excess purging of ink and creating a false ink empty message***. [Emphasis added.]

43.    None of this information was disclosed to customers.  To the contrary, BIC continued to market and sell MFC machines knowing that they suffer from undisclosed defects that BIC itself concedes are material, while reaping the profits from the sale of extra OEM ink.

44.     In keeping with BIC's intention to conceal this information from class members, Plaintiffs are informed and believe that even after BIC had access to a firmware update that was ostensibly developed to reduce the frequency with which BHL2 machines self-empty their ink cartridges, BIC intentionally withheld the firmware from distribution to class members.   For example, in an e-mail dated October 2004, BIC Product Support Specialist Brian Miller cautioned BIC personnel not to release the firmware to consumers:

> I am distributing a CD that contains the BHL2 ROM update Tool for fixing the Purge Problem.  This CD is ONLY for Product Support Specialist that go onsite to a customers location to investigate the Ink Empty problem.  This CD is NOT to be given to ASC or Customers. [Emphasis in original.]

45.     BIC continued to withhold a purported solution to the BHL2 ink-consumption defect, even though it knew class members were complaining about (and spending money as a result of) excessive ink consumption in very large numbers.   For example, in an e-mail message dated April 2005, BIC employee Nancy Coffman wrote the following:

> As you may know, we have customers who have purchased the BHL2 machines and are very unhappy with the amount of ink the unit consumes.  ***They feel they are required to replace the inks much too frequently even when there is very little use of their machines or of a particular color ink cartridge***.  Recently, a firmware was developed that improves the efficiency of the cleaning cycles which will extend the life of ink cartridges. . . .
>
> ***We would like to have this Firmware Update posted on the download page.  I understand Brian Miller requested this update be posted several months ago and Hirai-san did not feel it was a good idea***.  [Emphasis added.]

46.    Plaintiffs are informed and believe that one reason the firmware update was withheld from public distribution is that BIC did not want class members to find out that the firmware was designed to correct defects in MFC machines.   For example, in an e-mail exchange dated September 2004, BIC's Technical Support Manager, Wayne Gundlach, wrote

> We are excited about the recent announcement concerning the BHL2 ink consumption improvement. . . .  **of course, we still have to determine how we can implement this improvement *so that it does not appear that we are correcting a design problem* and minimize what could be a very expensive upgrade program**. [Emphasis added.]

47.    Ms. Coffman addressed the issue of concealment several months later, by proposing, in her April 2005 e-mail, that BIC could resolve its concern about disclosing the existence of defects by eliminating the word "problem" from the firmware's description on the download page of the BIC website.  Accordingly, Ms. Coffman suggested that BIC mislead class members by telling them that the firmware was designed to make changes to the purge cycle "to enhance ink efficiency."

48.    As of July 15, 2008, the only BHL2 firmware download that appears on http://www.brother-usa.com/downloads/ is one dated May 2005, which does not mention ink, or the ink-purge problem it is intended to address.  Thus, Plaintiffs are informed and believe that even Ms. Coffman's proposed, watered-down description gave consumers information that BIC did not want them to have.

49.    In addition to intentionally concealing information about the existence, nature and scope of these defects from individual class members,

Plaintiffs are also informed and believe that BIC intentionally concealed the same information from its large, corporate clients.   Unlike it did with individual consumers, however, BIC determined that "*if we receive complaints from our major accounts will have to take action to resolve this issue for them.*" (Emphasis added.)

50.    Nonetheless, Plaintiffs are informed and believe that BIC recognized it would not benefit BIC to admit to its major accounts that BIC had knowingly sold them defective MFC machines.  Consequently, BIC decided to say nothing and hope its major accounts would not notice that their MFC machines were wasting ink, while making back-up plans to resolve matters if and when they did.  For example, in October 2004 Mr. Stadler wrote the following:

> *Hopefully most of the major accounts print at least five days a week (heavy users) and will not notice the ink consumption.*  For [REDACTED]                              hotels where they have the MFC in the guest hotel room, I don't imagine that they are frequently used.  Below is Frank Martin's response to this situation.

> I already spoke to Tadashi about this yesterday specifically regarding the ITS accounts.  Basically I told him that the upgrade process for already installed machines will be a big problem for ITS since it can only be done where a room is vacant.  This will take a lot of ITS time so I am concerned that they may want some compensation for Brother to do the upgrade.

> To my knowledge the hotel          [REDACTED] have not complained about ink usage.  This is probably because the page count data is used by the hotel billing group but ink replacement by the IT group.  *These two groups are not exchanging data so they have no way of calculating ink usage.*

> *We will have to hope that they don't recognize the ink consumption issue, but you may want to budget some*

***provisional expense for the major accounts just in case***.
[Emphasis added.]

51.    BIC's treatment of its customers, regardless of whether they were major corporate clients or individual consumers, makes clear that BIC intentionally concealed defects from them as a means of shifting the cost of repairing or replacing BIC products from BIC to its customers.

## II.   THE ME41 DEFECT

52.    MFC machines also suffer from a defect that causes their print heads to fail catastrophically, leaving class members to pay for the installation of a new print head or to replace the entire machine (the "ME41 defect").  Plaintiffs are informed and believe that the defect is referred to as "ME41" because, when this defect becomes manifest in most affected series of MFC machines, those machines display the code "MACHINE ERROR 41"" on their LCD panels.

53.    The print head is the component that is most critical to the MFC machines' print performance.  It is also one of the most — if not ***the*** most — expensive components to replace.  Plaintiffs are informed and believe that the cost of replacing a single print head in an MFC machine can easily exceed the cost of the MFC machine itself, and because replacement print heads (as well as replacement MFC machines) are also susceptible to failure as a result of the ME41 defect, the need to replace the print head multiple times is not uncommon.

54.    Internal documents reveal that BIC has known, since at least 2001, that the ME41 defect was causing premature print-head failure in MFC machines. By June 2002, the ME41 defect was on BIC's list of "Top Quality Issues and Action

THIRD AMENDED COMPLAINT
No. 3:06-cv-04907

items."  And, despite numerous attempts to solve the problem, the ME41 defect

continued to plague MFC machines, as revealed by BIC's own internal documents.

For example:

- In November 2003, a BIL employee advised BIC that "Most of Ink model has this [Machine Error 41] problem.  So, we worry about this issue.  Could you correct the detail information and create the Fault Report?"

- In a document dated January 14, 2004, the ME41 defect was described as having "grown progressively worse without a solution."

- By March 2004, BIC had been informed by BIL that "from your . . . Field data, we have recognized this problem (ME41) will be picked up after 12 months.  I believe this is more reliable than lab test data.  You need expect several percentage of head replacement for three year time period [*sic*]."

- In an undated 2004-era document, BIC lists ME41 as the "largest single cost item affecting BHL."  In the same document, BIC admits that "[r]edesign of print head not shown to be very effective in reducing swaps.  Defect rate increasing.  BIC now inspecting product."

- In July 2004, Mr. Stadler asked if there had been "any progress to improve the quality of the BHL/BHL2 Print head to avoid ME41?" and was told by BIL that "we are going to modify the design inside head [*sic*].  The detail schedule is not fix [*sic*] yet but in the next month.  I am believing . . . , praying next one will be good."  Mr. Stadler was also told that the BHL2 print heads appeared to be even worse then their predecessors.

- In July 2004, BIC sent BIL its "ME41 forecast," which predicted rising print-head failures.   In response, BIL advised BIC that "we have started the estimation in multiple way one is worse and another in [*sic*] worse than your estimation.  We are preparing to manage it globally. . . .  As for the countermeasure print head, we will start modified production in next month. The production capacity is limited, so that we cannot replace once, so we need to ask you to use current style head for two month [*sic*]."

- In September 2004, Mr. Stadler stated that the "biggest issue" BIC faced "is ME41, Print Head failure."  He noted that BIC would "have had to swap over 14,000 customer's products this year for ME41 and the replacement products that we have sent to these customers had the

same Print Head.  ***Some customers have had their product replaced two, three or four times for the ME41 issue***."  (Emphasis added.)

55.    Consumers should not have to replace a print head even once, let alone multiple times.  As BIC internal documents make clear, MFC machine "print heads are considered machine components" and, as such, "***they are expected to last the life of the machine***," which Plaintiffs are informed and believe that BIC has determined to be at least five years or 50,000 pages.  (Emphasis added.)

56.    Plaintiffs are also informed and believe that, in 2004, BIC considered announcing the implementation of an extended warranty that would cover certain print heads that failed as a result of the ME41 defect.  Plaintiffs are informed and believe, however, that, in keeping with its efforts to conceal the existence of the ME41 defect, and to avoid negative publicity, BIC decided not to officially extend the print head warranty in 2004.  Instead, Plaintiffs are informed and believe that BIC elected to simply and secretly extend outside-warranty assistance to those consumers who complained loudly enough to the right customer-service representative. Accordingly, Plaintiffs are informed and believe that BIC did not publicly advise consumers of the potential availability of extra-warranty assistance.

57.    When BIC finally, quietly, implemented a limited extended warranty in or around February 2005 (which extends the warranty coverage on some MFC machine print heads that fail as a result of the ME41 defect from 90 days to 24-months from the date of purchase or 30 months from the date of the serial number), Plaintiffs are informed and believe that it did so simply for the purpose of creating

**THIRD AMENDED COMPLAINT**
No. 3:06-cv-04907

the appearance that it had taken corrective measures as a means of avoiding class-action litigation — which BIC personnel acknowledged was likely:

> For your information, we have done the email broadcast and are posting the announcement in an effort to avoid or defend any class action regarding the Print Head issue.

58.     Plaintiffs are informed and believe that, in keeping with the notion of merely making it look like BIC was doing something about ME41, without actually providing a substantive remedy for the vast majority of consumers affected by the ME41 defect, BIC limited the extended warranty to a fraction of affected models of MFC machines (just 10), and took measures to ensure that the vast majority of persons entitled to extended warranty coverage would not find out about the availability of that coverage.

59.     For example, in February 2005, Mr. Stadler described how BIC had taken steps to minimize the likelihood that consumers would find out about the extended warranty by burying the "announcement" of its availability on an obscure section of its website, and by timing the appearance of the extended warranty announcement with Press Releases regarding the availability of new products:

> Attached is the extended Print Head warranty announcement that we will post on Brother-usa.com under 'To Inform-Press-Fax Machines and Multi-Function Center" and the Warranty Statement that will link to that announcement. It's scheduled to be posted on Tuesday, February 22nd.
>
> ***I will also try to have a few New Product Press Releases (see attached) posted at the same time, so that there's not as much attention to the extended warranty announcement***. [Emphasis added.]

60.     Plaintiffs are informed and believe, that in addition to failing to notify Plaintiffs and members of the proposed class of the availability of the extended warranty, BIC did not reimburse consumers who were forced to replace the defective print heads (or the entire MFC machine) at their own expense.

61.     Additionally, to the extent that BIC discussed the extended warranty publicly at all, Plaintiffs are informed and believe that it did so in a manner calculated to downplay the problems caused by the ME41 defect and to intentionally mislead consumers (as well as current and prospective shareholders) by concealing the true nature, scope and extent of ME41 defect.  For example, the 2005 Brother Group Social & Environmental Report contains demonstrably false statements by former BIL President, Seiichi Hirata, who claimed that the Brother Group did not receive reports of the ME41 defect until Fiscal Year ("FY") 2005 (*i.e.,* March 31, 2004-March 31, 2005), and that the ME41 defect was a thing of the past.  More specifically, in a "Question and Answer" section of the 2005 Brother Group Social & Environmental Report, Mr. Hirata made the following comments:

> Specifically, ***in FY 2005, we had quality issues reported* with some of our ink-jet facsimile machines and ink-jet multifunction products *that had been produced in the past*.**  We are sincerely sorry for the significant inconvenience caused to our customers (see page 22).  For a company with the motto 'At your side,' this was the most regretful incident.  Again, I wish to express our heartfelt apology to our customers and stockholders.  [Emphasis supplied.]

62.     On page 22 of the same report, Brother Group members again falsely told consumers and stockholders that they did not learn of the existence of the ME41 defect until 2004; falsely stated that the ME41 defect is limited to just 15 models of MFC machines and faxes manufactured between July 2001 and

**THIRD AMENDED COMPLAINT**
No. 3:06-cv-04907

September 2004; falsely suggested that BIC conveyed accurate information about the ME41 defect to consumers over its websites; and falsely stated that it BIC is "promptly offering repairs for any relevant problem."

63.     Plaintiffs are informed and believe that this information is not accurate.   BIC did *not* discover the ME41 defect in 2004 (but learned that information years earlier); the ME41 defect is *not* limited to 15 models of MFC machines and fax machines manufactured between July 2001 and September 2004; accurate information about the ME41 defect was *not* provided over the BIC website; and BIC is *not* "promptly offering repairs for any relevant problems."

64.     In actuality, as alleged in more detail above, BIC internal documents show that BIC was aware of the ME41 defect in 2001, not "FY 2005."  They also reveal that BIC was acutely aware, that the ME-41 defect continued to plague MFC machines manufactured after September 2004.  For example, in a report April 2005, Mr. Stadler noted that the ME41 defect was BIC's "Number One Quality issue . . . ," and noted the high volume of calls, swaps, work orders, and warranty claims BIC expected to receive in 2005.

65.     Additionally, Plaintiffs are informed and believe that BIC knew its newer series of MFC machines, the BH3 series, also suffers from the ME-41 defect. Yet, Plaintiffs are informed and believe that BIC intentionally excluded the BH3 machines from the extended warranty, so as to conceal the existence of the ME41 defect in these machines from consumers.

66.     Plaintiffs are also informed and believe that, to continue to conceal the fact that the BH3 series of MFC machines suffers from the ME-41 defect, BIC

*eliminated the reference to the ME41 error code itself*.  That is, Plaintiffs are informed and believe that BH3 series MFC machines do not display the "Machine Error 41" code when their print heads fail as a result of the ME41 defect.  Thus, BIC has made it *appear* as though the machines cease functioning for a different reason, even though the underlying problem is the same.

67.     Plaintiffs are informed and believe that the revised ME41 defect error codes are discussed in an internal BIC document dated December 2004, titled "BH3 Series Machine Error 41."  Under a heading titled "1. Symptom (a) LCD shows error message and cannot use," BIC lists the following four error codes as the new ME41 "symptom" codes:  "Cannot Init.", "Unable to Print," "Unable to Clean," and "High Temperature."

68.     Plaintiffs are informed and believe that, by eliminating the ME41 error code, as opposed to eliminating the ME41 defect, BIC intentionally sought to prevent consumers from associating the print-head problems they encountered with the same problem others had been experiencing since at least 2001, thereby concealing that newer model MFC machines continued to suffer from the same defect.

69.     Plaintiffs are informed and believe that the existence of the ME-41 defect in the BH3 and newer machines prompted the development of a new firmware update that Plaintiffs are informed and believe is designed to make the print heads in the later-model machines last long enough so that their eventual failure occurs outside of the normal warranty, at consumers' expense.

70.   Plaintiffs are informed and believe that the availability of this firmware update presented a dilemma for BIC; namely, how to persuade consumers to install it in MFC machines that BIC had already sold, without conceding the existence of the ME41 defect in the later-model MFC machines.

71.   Plaintiffs are informed and believe that BIC resolved this dilemma by intentionally misleading consumers about why they should install the firmware update.  It did so in a number of ways.

72.   For example, in an internal BIC document dated May 2005, Mr. Stadler cautioned against using the word "problem" in the firmware-update description. More specifically, he wrote

> I would like to first comment on the BH3 Firmware Update description.  I don't like the statement 'Fixes the following problems:'. The meaning of 'update' is to revise or modernize, and when something is revised or modernized it's not necessarily fixing a problem."

73.   In other words, Plaintiffs are informed and believe that, one way BIC intentionally sought to conceal the existence of the ME41 defect from class members was by ensuring the word "problems" — a potential red flag to consumers — was deleted from the BH3 firmware-update description.

74.   The elimination of the word "problems" from the description of the BHS firmware update was not the only material information BIC purposefully deleted from that description:  To keep consumers from discovering that the BH3 series of MFC machines also suffered from the ME41 defect, ***BIC also eliminated all references to ME41 from the firmware's descriptions***.  That is, Plaintiffs are informed and believe that consumers who learned of the software upgrade were

told to install it for reasons that had nothing to do with the ME41 defect.   BIC's

decision to intentionally mislead its customers in this manner was explained in an

internal e-mail message dated April 2005, which reads, in part, as follows:

> An example of how we would like to have the BHL2 Firmware update
> posted on the download page would be the recent BH3 firmware
> update . . . **One of the improvements included with the BH3
> update is the countermeasure for the ME41 issue.  However, this
> information is not listed with the update.**   We feel the BHL2
> Firmware update can be posted in the same manner." (Emphasis
> supplied.)

75.    A copy of a BIC document that discusses the purpose of the 2005 BH3

firmware update can be found on the download section of the Brother website.[4]   In

keeping with BIC's decision to conceal the existence of the ME41 defect from

consumers, that description makes no mention of the "problem" BIC was

experiencing with the BH3 series, nor does it mention that the purpose of the

firmware is to address the ME41 defect.

76.    Plaintiffs are informed and believe that BIC also unjustly sought to

minimize expenses it incurred as a result of intentionally selling defective MFC

machines to unsuspecting consumers by limiting ME41 extended warranty coverage

to just a few affected models of MFC machines, rather than covering all affected

MFC machines, and by making sure those limits were strictly enforced.   For

example, in a February 2007 newsletter sent to its Authorized Service Center

('ASC") technicians, BIC warned them not to provide coverage under the ME41

warranty extension to MFC machines that were not on the approved list:

---

[4] http://welcome.solutions.brother.com/bsc/public/nc/firmwarereleasenotes.aspx.

**THIRD AMENDED COMPLAINT**
No. 3:06-cv-04907

Brother International's Administration Department has been receiving Warranty Claims for Machine Error 41 on models that are not covered in the extended warranty period for this error.  As a friendly reminder, ***listed below are the only models covered under Machine Error 41 extended warranties.  All other models are excluded from the extended warranty and will only be covered under the normal warranty period***.

The Machine Error 41 Extended Warranty Period is 30 months from serial Number of 24 months from Prof of Purchase on the following models:

FAX-1800c, FAX-1820C, FAX-1920CN, MFC-3100C, MFC3200C, MFC-3220C, MFC-3320CN, MFC-3420CN, MFC-3820CN, MFC-4420CN, MFC-4820CN, MFC-5100C and MFC-5200C.  [Emphasis added.]

77.     Plaintiffs are also informed and believe that BIC sought to recoup some of the money it was forced to spend as a result of the ME41 defect by using disinformation to scare consumers who were using generic ink into purchasing OEM ink, and to create a false-sense of goodwill towards BIC at the same time. BIC did so by advising customers who experienced print-head failure as a result of the ME41 defect that they had caused the print head to fail by using non-OEM ink, and by offering to repair the machine even though the customer purportedly caused the damage.

78.     In actuality, BIC knows non-OEM ink does not cause the ME-41 defect and, as such, the law prohibits it from denying warranty claims on that basis.  In an internal document dated January 2005, BIC's Senior Manager for Customer Support, Michelle Leszega, explained how the scheme was to work:

***Since this was an ME41 issue, we know generic ink is not causing the problem***. With that in mind, we should take care of the customer within the extended warranty period.

***We want the customer to believe they created the issue by using generic ink and that BIC is their hero for still taking care of their issue under warranty***.  Now that they gave a working BIC product, they will think twice before using generic ink again.  In a couple of years when they look to replace the Fax/MFC, they will think of BIC because we took care of their problem.

Also, ***I would explain to the ASC that we're not sure if the generic ink is creating the ME41 problem, but we still want to take care of the customer***.  [Emphasis supplied.]

79.     Plaintiffs are also informed and believe that BIC has intentionally chosen not to tell its ASC (Authorized Service Center) technicians that the use of non-OEM ink does not cause the ME41 defect as a means of ensuring that consumers will continue to believe that the use of non-OEM ink could cause their print heads to catastrophically fail.  Accordingly, when discussing ME41 issues with their ASC technicians, Plaintiffs are informed and believe that BIC purposefully includes this deliberately ambiguous message (or one substantially similar to it) in those communications:

> While the exact cause of this particular error is unknown, Brother strongly recommends the use of Genuine Brother replacement ink cartridges.  ***Use or attempted use of potentially incompatible ink and/or cartridges may cause damage to the machine and/or may result in unsatisfactory print quality.  Our warranty coverage does not apply to any problem that is caused by the use of unauthorized third party ink and/or cartridges.***  To protect their investment and obtain premium performance from the Brother machine, Brother strongly recommends customers use genuine Brother supplies.  [Emphasis added.]

80.     Plaintiffs are informed and believe that, to reduce, even further, its exposure to warranty liability for having intentionally sold defective MFC machines in the first place, BIC decided that it would "change the basic policy of swapping the

customer's products if it was purchase within the last 12 months to swapping the customer's products if it was purchased within the last 6 months [*sic*]."

81.     There were two exceptions to Brother's new policy:  In keeping with Brother's desire to favor large purchasers over individual consumers, Brother decided that "if the customer is a Major Account we should continue to swap their product."   And, as it did to avoid negative publicity before formally extending the ME41 warranty to a few affected MFC machines, Brother also decided that it would make an exception if an individual consumer complained loudly enough, and allow a supervisor to approve the swap.

82.     As a result of BIC's conduct, Plaintiffs are informed and believe that a substantial numbers of consumers have been left to pay to replace defective print heads on their MFC machines or the machines themselves, and a substantial number of other consumers will be left to pay to replace the defective print heads on their MFC machines when those print heads fail, as BIC fully expects them to.

## PLAINTIFF MANISCALCO'S EXPERIENCE

83.     Plaintiff Maniscalco purchased his MFC machine in late 2004, believing that the machine would be economical to purchase and maintain.  Since then, the MFC machine repeatedly displayed false "empty" messages when the ink cartridges actually had ink left in them.  Moreover, Mr. Maniscalco's MFC machine went into "self-cleaning" mode so frequently that it substantial amounts of ink to be depleted from the inkjet cartridges — including the color cartridges, despite the fact that Mr. Maniscalco very seldom printed or copied in color.  Indeed, Mr. Maniscalco

is informed and believes that the majority of the ink that his MFC machine used was depleted during the self-cleaning process.

84.     Because the MFC machine cannot operate when an inkjet cartridge requires replacement (actually or because it displays a false "empty" message), Mr. Maniscalco has been forced to purchase new inkjet cartridges.  Because he saw statements attributed to BIC in local office-supply stores that the use of non-OEM ink could harm MFC machines, Mr. Maniscalco purchased only BIC (OEM) inkjet cartridges for his MFC machine.

85.     On or about March 23, 2007, Mr. Maniscalco's MFC machine displayed a "Machine Error 41" message on its LCD screen and ceased functioning. Accordingly, Mr. Maniscalco has been forced to purchase a replacement machine, so he purchased a machine from one of BIC's competitors.

86.     Before he purchased his MFC machine, Mr. Maniscalco was unaware that that MFC machines falsely display "ink empty" messages even though their inkjet cartridges are not actually empty; that MFC machines deplete ink cartridges even when they are not used due to their "self-cleaning feature"; and that MFC machines are likely to fail due to ME41 defect.  Had BIC disclosed this information to Mr. Maniscalco, he would not have purchased the MFC machine.

87.     As a result of BIC's concealment and failure to disclose this information, Mr. Maniscalco has been deprived of using all the ink in his inkjet cartridges and has been forced to purchase replacement inkjet cartridges prematurely, and has been forced to replace his MFC machine as a result of the

ME41 defect.  Consequently, Mr. Maniscalco has suffered an ascertainable loss and actual injury.

## PLAINTIFF HURYK'S EXPERIENCE

88.   Plaintiff Walter Huryk purchased a Brother MFC-3220C on December 11, 2003 in South Carolina.  Mr. Huryk noticed that when the machine indicated that his ink cartridges were "empty," the machine would stop functioning until any and all "empty" cartridges were replaced.  Upon inspection, he found that the cartridges were not actually empty.

89.   Mr. Huryk mostly used his machine to print black-and-white documents.  He estimates that his MFC machine would print roughly 80 to 120 pages before one or more cartridges would have to be replaced.

90.   In March of 2007, Mr. Huryk's machine displayed "Machine Error 41" on its LCD screen and stopped functioning.   Shortly thereafter, Mr. Huryk contacted BIC for assistance with his MFC machine.  A month later, BIC informed Mr. Huryk that his machine was no longer covered by his warranty, and that he would have to pay for his own repairs.

91.   On or about April 26, 2007, Mr. Huryk bought a multifunction machine from one of BIC's competitors to replace his MFC machine.   Mr. Huryk disposed of his non-functioning MFC machine.

92.   Before he purchased his MFC machine, Mr. Huryk was unaware that that MFC machines falsely display "ink empty" messages even though their inkjet cartridges are not actually empty; that MFC machines deplete ink cartridges even when they are not used due to their "self-cleaning feature"; and that MFC machines

are likely to fail due to ME41 defect.  Had BIC disclosed this information to Mr. Huryk, he would not have purchased the MFC machine.

93.   As a result of BIC's concealment and failure to disclose this information, Mr. Huryk has been deprived of using all the ink in his inkjet cartridges and has been forced to purchase replacement inkjet cartridges prematurely, and has been forced to replace his MFC machine as a result of the ME41 defect. Consequently, Mr. Huryk has suffered an ascertainable loss and actual injury.

<u>CLASS ALLEGATIONS</u>

94.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all others similarly situated.  The class that Plaintiffs seek to represent in this action is as follows:  All consumers who purchased Brother MFC machines for use, and not resale, in the United States, and all consumers who purchased OEM ink for use in MFC machines from October 2000 to the present.  Excluded from the class are the following:

    a.    BIC, its subsidiaries and affiliates, officers, directors, and employees;

    b.    Persons who have settled with and validly released BIC from separate, non-class legal actions based on the conduct alleged herein;

    c.    The presiding judge in this matter; and

    d.    Jurors who are called upon to hear this matter.

95.    Plaintiffs are informed and believe that there are millions current and former owners of MFC machines throughout the United States.  The class is, therefore, so numerous and geographically dispersed that joinder of all members in one action is impracticable.

96.    BIC has acted with respect to Plaintiffs and members of the proposed Class in a manner generally applicable to each of them.  There is a well-defined community of interest in the questions of law and fact involved, which effect all class members.  The questions of law and fact common to the class predominate over the questions that may affect individual class members, including the following:

> a.    Whether the inkjet cartridges BIC used in MFC machines cause the machine to produce a warning message that falsely indicates that the cartridge is empty when it is not;
>
> b.    Whether the technology BIC uses in its MFC machines causes them to deplete the ink in inkjet cartridges, even when those cartridges are not used;
>
> c.    Whether the technology BIC uses in its MFC machines causes them to deplete the ink in inkjet cartridges more quickly than they would if that technology was not used in MFC machines;
>
> d.    Whether BIC intentionally concealed or failed to adequately disclose to prospective purchasers of MFC machines that those machines indicate that their inkjet cartridges are empty when they are not;

e.  Whether BIC intentionally concealed or failed to adequately disclose to prospective purchasers of MFC machines that the self-cleaning "feature" in those machines will deplete ink in the machines' inkjet cartridges and force them to be replaced prematurely;

f.  Whether MFC machines suffer from the ME41 defect;

g.  Whether BIC intentionally concealed or failed to adequately disclose to prospective purchasers of MFC machines of the existence, nature, or scope of the ME41 defect;

h.  Whether BIC's conduct constitutes violations of the CFA;

i.  Whether BIC's conduct led to its unjust enrichment;

j.  Whether class members are entitled to treble damages pursuant to the CFA; and

k.  Whether class members whose MFC machines have yet to malfunction due to the ME41 defect are entitled to declaratory relief that obligates BIC to repair or replace those machines when the ME41 defect causes them to stop functioning.

97.  Plaintiffs will fairly and adequately represent and protect the interests of the Class, and do not have interests that are antagonistic to or in conflict with those they seek to represent.

98.  Plaintiffs have retained counsel who have considerable experience in the prosecution of class actions and other forms of complex litigation.

99.    In view of the complexity of the issues and the expense that an individual plaintiff would incur if he or she attempted to obtain relief from a large corporation such as BIC, the separate claims of individual class members are monetarily insufficient to support separate actions.   Because of the size of the individual class members' claims, few, if any, class members could afford to seek legal redress for the wrongs complained of in this Complaint.

100.   The proposed class is readily definable, and prosecution as a class action will eliminate the possibility of repetitious litigation and will provide redress for claims too small to support the expense of individual, complex litigation.   Absent a class action, class members will continue to suffer losses, BIC's violations of law will be allowed to proceed without a full, fair, judicially supervised remedy, and BIC will retain sums received as a result of its wrongdoing.   A class action therefore provides a fair and efficient method for adjudicating this controversy.

101.   The prosecution of separate claims by individual class members would create a risk of inconsistent or varying adjudications with respect to thousands of individual class members, which would, as a practical matter, dispose of the interests of the class members not parties to those separate actions or would substantially impair or impede their ability to protect their interests and enforce their rights.

## FIRST CLAIM FOR RELIEF
### (Declaratory Relief)

102.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

---

**THIRD AMENDED COMPLAINT**
No. 3:06-cv-04907

103.   Pursuant to Federal Rule of Civil Procedure 57, Plaintiffs seek a declaration of the parties' rights and duties with respect to the ME41 defect.

104.   Plaintiffs allege that BIC knew of the existence, nature, and scope of the ME41 defect at least as early as 2001, but concealed and failed to disclose what it knew about the ME41 defect to prospective purchasers, including Plaintiffs and members of the proposed class.

105.   Plaintiffs also allege that BIC knew that the ME41 created an inordinate propensity for the MFC machines to stop functioning well before their expected useful life of five years or 50,000 pages of printed material, but concealed and failed to disclose that information to Plaintiffs and members of the proposed class.

106.   Plaintiffs allege that BIC's concealment and failure to disclose to Plaintiffs and the proposed class that the ME41 defect was likely to cause the print heads in MFC machines to fail prematurely (*i.e.*, before the end of the useful life that BIC determined to be five years or 50,000 pages of printed material) constitutes an unconscionable commercial practice in violation of N.J.S.A. § 56:8-2.

107.   Plaintiffs also allege that BIC's arbitrary limitation of warranty coverage for print heads that fail due to the ME41 defect, constitutes an unconscionable commercial practice in violation of N.J.S.A. § 56:8-2.

108.   BIC disputes these allegations.

109.   Therefore, an actual controversy has arisen and now exists between BIC and Plaintiffs and the class they propose to represent in this action. Accordingly, Plaintiffs hereby request a judicial declaration of the rights and duties

of the parties with respect to each of the foregoing issues in controversy. Specifically, Plaintiffs seek a judicial declaration (a) that BIC's conduct violates the CFA (N.J.S.A. § 56:8-2) and (b) that BIC is obligated to reimburse class members for the cost of repairing and/or replacing MFC machines whose print heads fail due to the ME41 defect after judgment is entered in this action.

## SECOND CLAIM FOR RELIEF
### (Violations of N.J.S.A. § 56:8-2)

110.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

111.   BIC is engaged in trade and commerce, and maintains its principal place of business, in the State of New Jersey.

112.   As discussed in paragraphs 1 through 93 of this Complaint, BIC has violated N.J.S.A. § 56:8-2 by engaging in unfair, fraudulent, and unconscionable conduct, including the following:

a.   Marketing, advertising, and selling MFC machines that falsely indicate that the inkjet cartridges are empty when they are not, and preventing the use of the machines (and the ink that Plaintiffs and class members purchased) until the inkjet cartridges are replaced;

b.   Intentionally concealing and failing to disclose prospective purchasers of MFC machines that the self-cleaning feature depletes ink from inkjet cartridges even when those cartridges are not used, and accelerates the depletion of ink that is used for

printing, thereby forcing Plaintiffs and members of the class to purchase replacement inkjet cartridges prematurely and more frequently than they would but for this "feature";

c.   Marketing, advertising, and selling machines that they know are likely to fail due to the ME41 defect before their expected useful life of five years or 50,000 pages of printed material, while intentionally concealing and failing to disclose that information to prospective purchasers; and

d.   Unconscionably limiting warranty coverage for print-head failure caused by the ME41 defect, despite BIC's knowledge that the ME41 defect would cause print heads in MFC machines to fail after the warranty period expired, but before the projected useful life of the MFC machines, thereby shifting the cost of repair and replacement from BIC to Plaintiffs and members of the class they propose to represent.

113.   As a proximate result of BIC's conduct, as alleged above, Plaintiffs and the class they propose to represent have suffered an ascertainable loss and actual injury for which they are entitled to legal and equitable relief, including treble damages and an injunction prohibiting BIC from continuing to engage in such conduct.

## THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

114.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

115.   As alleged in above, Plaintiffs and the Class they propose to represent have needlessly purchased replacement inkjet cartridges from BIC as a result of (a) warnings produced by MFC machines that inkjet cartridges were empty when they were not; (b) the MFC machines' depletion of ink from inkjet cartridges even when they are not used, and accelerate the depletion of ink when the machines are used; and (c) BIC's efforts to persuade class members to refrain from purchasing non-OEM ink by advising them that MFC machines could be damaged if they use non-OEM inkjet cartridges.  BIC has thereby unfairly and deceptively increased its sales of inkjet cartridges.

116.   In addition, BIC has known that ME41 defect is causing (and continues to cause) MFC machines' print heads to fail, which cannot be used without purchasing new print heads.  Despite the fact that BIC has known about the ME41 defect since at least 2001, and despite the fact that BIC has known that the ME41 defect can and does cause MFC machines print heads to fail after BIC's limited warranty expires and before the end of the end of the useful life of the MFC machines (which Plaintiffs are informed and believe is five years or 50,000 pages of printed material), BIC has failed to notify Plaintiffs and class members of the true nature and scope of the ME41 defect.

117.   Instead, BIC sought to avoid the costs relating to print-head failure caused by the ME41 defect by imposing limitations on its warranty coverage and shifting the cost of repair and replacement to Plaintiffs and members of the proposed class.  BIC also sought to exploit the ME41 defect by suggesting that print-head failure caused by the ME41 defect was actually caused by the use of non-OEM inkjet cartridges, despite BIC's express recognition (internally) that the use of non-OEM ink has nothing to do with print-head failure.  BIC has also failed to offer reimbursement of the cost of repair or replacement to those whose MFC machines' print heads have failed due to the ME41 defect.

118.   As a proximate result of BIC's conduct, BIC obtained secret profits by which it became unjustly enriched at the expense of Plaintiffs and proposed class members.  It would be unfair for BIC to retain the profits it has unjustly received at the expense of the Plaintiff and the proposed class.

119.   Accordingly, Plaintiffs and the class seek an order establishing BIC as a constructive trustee of the profits that served to unjustly enrich BIC, together with interest during the period in which BIC has retained such funds, and requiring BIC to disgorge those funds to Plaintiffs and members of the proposed class in a manner to be determined by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief in this Complaint as follows:

**THIRD AMENDED COMPLAINT**
No. 3:06-cv-04907

1.      For an order certifying that the action may be maintained as a class action, on behalf of the proposed Class and any subclass(es) the Court may deem appropriate;

120.    For a judicial declaration declaration (a) that BIC's conduct violates the CFA (N.J.S.A. § 56:8-2) and are entitled to an award of damages and injunctive relief pursuant to the CFA, and (b) that BIC is obligated to reimburse class members for the cost of repairing and/or replacing MFC machines that fail due to the ME41 defect after judgment is entered in this action;

2.      For an order awarding treble damages for BIC's violations of N.J.S.A. § 56:8-2;

3.      For an order establishing BIC as a constructive trustee of the profits that served to unjustly enrich BIC, together with interest during the period in which BIC has retained such funds, and requiring BIC to disgorge those funds to Plaintiffs and members of the proposed class in a manner to be determined by the Court;

4.      For an award of attorney fees;

5.      For an award of costs;

6.      For an award of pre- and post-judgment interest on all amounts awarded; and

7.      For any and all other relief that the Court may deem just and appropriate.

THIRD AMENDED COMPLAINT
No. 3:06-cv-04907

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs and the Class demand a jury trial in this action for all the claims so triable.

DATED:  July 28, 2008                    Respectfully submitted

                                         By s/ *Lisa J. Rodriguez*

                                         Lisa J. Rodriguez (lisa@trrlaw.com)
                                         TRUJILLO RODRIQUEZ & RICHARDS LLC
                                         8 Kings Highway West
                                         Haddonfield, NJ  08033
                                         T:  856-795-9002
                                         F:  856-795-9887

                                         Jeffrey L. Fazio (jlf@fazmiclaw.com)
                                         Dina E. Micheletti (dem@fazmiclaw.com)
                                         FAZIO | MICHELETTI LLP
                                         2410 Camino Ramon, Suite 290
                                         San Ramon, CA  94583
                                         T:  925-543-2555
                                         F:  925-369-0344

                                         Lisa M. Mezzetti (lmezzetti@cmht.com)
                                         Douglas J. McNamara
                                          (dmcnamara@cmht.com)
                                         COHEN, MILSTEIN, HAUSFELD & TOLL
                                         P.L.L.C.
                                         West Tower, Suite 500
                                         1100 New York Avenue, N.W.
                                         Washington, D.C.  20005
                                         T:  202-408-4600
                                         F:  202-408-4699

                                         Melissa M. Harnett
                                          (mharnett@wcclaw.com)
                                         WASSERMAN COMDEN & CASSELMAN,
                                         L.L.P.
                                         5567 Reseda Boulevard, Suite 330
                                         Post Office Box 7033
                                         Tarzana, California 91357-7033

2a3e1e015157d534

T:  818-705-6800
F:  818-345-0162

Counsel for Plaintiffs
Mark Maniscalco and Walter Huryk,
 on behalf of themselves and all
 others similarly situated