UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARK MANISCALCO and WALTER HURYK, on behalf of themselves and all others similarly situated, | No. 3:06-cv-04907-FLW-TJB |
| Plaintiffs, | |
| vs. | *Oral Argument Requested* |
| BROTHER INTERNATIONAL CORPORATION (USA), | |
| Defendant. | Hon. Freda L. Wolfson |

---

## CORRECTED *MANISCALCO* PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Leonard J. Coates
TURP, COATES, ESSL & DRIGGERS, P.C.
170 South Main Street
Highstown, NJ 08520
T: 609-448-0016
F: 856-448-0127

Jeffrey L. Fazio
Dina E. Micheletti
FAZIO | MICHELETTI LLP
2410 Camino Ramon, CA 94583
T: 925-543-2555
F: 925-369-0344

Melissa M. Harnett
WASSERMAN COMDEN & CASSELMAN, LLP
5567 Reseda Boulevard, Suite 330
Post Office Box 7033
Tarzana, California 91357-7033
T: 818-705-6800
F: 818-345-0162

Lisa M. Mezzetti
Douglas McNamara
COHEN MILSTEIN SELLERS & TOLL P.L.L.C.
1100 New York Ave., N.W.
Washington, D.C. 20005
Telephone: 202-408-4600
Telecopier: 202-408-4699

*Attorneys for Plaintiffs Mark Maniscalco and Walter Huryk,*
*on behalf of themselves and all others similarly situated*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................ 1

II.    SUMMARY OF PERTINENT FACTS ............................................ 4

    A.    The ME41 Defect........................................................... 4

    B.    The Ink-Purging Defect ................................................ 11

    C.    Plaintiffs' Experience With Their MFC Machines................................ 16

III.    ARGUMENT................................................................ 17

    A.    BIC's Failure to Address the Ink-Purging Defect in Its Motion
        Precludes Summary Judgment ............................................... 17

    B.    New Jersey Law Provides the Rules of Decision ............................. 19

        1.    Restatement Section 148(1) is Inapplicable to This
                Case ................................................................ 21

        2.    Applied as Intended, Restatement Sections 148(2)
                and 6 Demonstrate That New Jersey Has the Most
                Significant Relationship to This Dispute ................................ 23

    C.    Plaintiffs Have Suffered an Ascertainable Loss.................................... 33

    D.    BIC Repeatedly Breached Its Duty to Disclose to Disclose the ME41
        and the Ink-Purging Defects ............................................... 39

IV.    CONCLUSION ............................................................ 40

## TABLE OF AUTHORITIES

### Cases !

*Agostino v. Quest Diagnostics Inc.,*
  256 F.R.D. 437 (D.N.J. 2009) ......................................................... 21, 22, 23

*Alban v. BMW of N. Am., LLC,*
  2010 U.S. Dist. LEXIS 94038 (D.N.J. Sept. 8, 2010) ..................................... 34

*Almog v. Israel Travel Advisory Service, Inc.,*
  298 N.J. Super. 145 (N.J. App. Div. 1997) ............................................. 31

*Arcand v. Brother Int'l Corp.,*
  673 F. Supp. 2d 282 (D.N.J. 2009) ......................................... 20, 25, 35, 36

*Bayer AG & Bayer Corp. v. Schein Pharm.,*
  129 F. Supp. 2d 705 (D.N.J. 2001) ..................................................... 19

*Berg Chilling Sys., Inc. v. Hull Corp.,*
  435 F.2d 455 (3d Cir. 2006) ............................................................ 25

*Boyes v. Greenwich Boat Works, Inc.,*
  27 F. Supp. 2d 543 (D.N.J. 1998) ................................................ passim

*Butkera v. Hudson River Sloop "Clearwater," Inc.,*
  300 N.J. Super. 550 (N.J. App. Div. 1997) .............................................. 31

*Byrnes v. Billion BMW, Inc.,*
  2008 WL 4131509 (App. Div. 2008) ..................................................... 39

*Celex Group v. Executive Gallery,*
  877 F. Supp. 1114 (N.D. Ill. 1995) ..................................................... 40

*Clawans v. United States,*
  75 F. Supp. 2d 368 (D.N.J. 1999) ...................................................... 31

*Cooper v. Samsung Elecs. of Am., Inc.,*
  2008 U.S. Dist. LEXIS 75810 (D.N.J. Sept. 30, 2008),
  *aff'd,* 374 Fed. Appx. 250 (3d Cir. 2010 .............................................. 30

*Cox v. Sears Roebuck & Co.,*
  138 N.J. 2 (N.J. 1994) ............................................................ 30, 39

*Dal Ponte v. Am. Mort. Express Corp.,*
  2006 U.S. Dist. LEXIS 57675 (D.N.J. Aug. 17, 2006) ................................... 31

*David B. Lilly, Inc. v. Fisher,*
  18 F.3d 1112 (3d Cir. 1994) ............................................................ 25

*Dewey v. Volkswagen AG,*
  558 F. Supp. 2d 505 (D.N.J. 2008) ..................................................... 39

*Duffy v. Samsung Elecs. of Am., Inc.,*
  2007 U.S. Dist. LEXIS 14792 (D.N.J. Mar. 2, 2007) ................................... 33

*Elias v. Ungar's Food Prods.,*
  2009 U.S. Dist. LEXIS 74140 (D.N.J. Aug. 20, 2009) ............................... 29

*Elias v. Ungar's Food Prods.,*
  252 F.R.D. 233 (D.N.J. 2008) ..................................................................... 31

*Fountain v. Filson,*
  336 U.S. 681 (1949) ..................................................................................... 18

*Fu v. Fu,*
  160 N.J. 108 (N.J. 1999) ..................................................................... 24, 26, 29

*Furst v. Einstein Moomjy, Inc.,*
  182 N.J. 1 (2004) .......................................................................................... 30

*Gantes v. Kason Corp.,*
  145 N.J. 478 (N.J. 1996) .............................................................................. 32

*Henderson v. Volvo Cars of No. Am. LLC,*
  2010 U.S. Dist. LEXIS 73624 (D.N.J. July 21, 2010) ............................... 34

*In re Collins & Aikman Corp. Sec. Litig.,*
  438 F. Supp. 2d 392 (S.D.N.Y. 2006) ........................................................ 21

*In re Mercedes-Benz Tele Aid Contract Litig.,*
  2009 U.S. App. LEXIS 12478 (3d Cir. June 4, 2009) ................................ 23

*In re Mercedes-Benz Tele Aid Contract Litig.,*
  2010 U.S. App. LEXIS 8087 (3d Cir. Apr. 19, 2010) ................................ 23

*In re Mercedes-Benz Tele Aid Contract Litig.,*
  257 F.R.D. 46 (D.N.J. 2009) ............................................................ 22, 25, 30, 32

*In re Mercedez-Benz Tele Aid Contract Litig.,*
  2010 U.S. Dist. LEXIS 74909 (D.N.J. July 22, 2010) ............................... 23

*International Union of Operating Engineers Local #68*
*Welfare Fund v. Merck & Co., Inc.,*
  384 N.J. Super. 275 (N.J. App. 2006),
  *rev'd on other grounds,* 192 N.J. 372, 388 n. 3 (N.J. 2007) ........................ 32

*Klaxon v. Stentor Elec. Mfg. Co.,*
  313 U.S. 487 (1941) ..................................................................................... 19

*Knox v. Samsung Elecs. of Am., Inc.,*
  2009 U.S. Dist. LEXIS 53685 (D.N.J. June 25, 2009) ............................... 30

*Laborers' Int'l Union v. Foster Wheeler Corp.,*
  26 F.3d 375 (3d Cir. N.J. 1994) .................................................................. 18

*Lee v. Carter-Reed Co., L.L.C.*,
   2010 N.J. LEXIS 951  (N.J. Sept. 30, 2010) ................................................36

*Luppino v. Mercedes-Benz USA, LLC*,
   2010 U.S. Dist. LEXIS 83584 (D.N.J. Aug. 13, 2010) ..............................34

*Martinelli v. K-Mart Corp.*,
   318 N.J.Super. 554 (N.J. App. Div. 1999) ...............................................31

*Mazza v. Am. Honda Motor Co.*,
   254 F.R.D. 610 (C.D. Cal. 2008) ..............................................................20

*Mercedes-Benz Tele Aid Contract Litig.*,
   267 F.R.D. 113 (D.N.J. 2010) ................................................20, 22, 26, 30

*Nafar v. Hollywood Tanning Sys., Inc.*,
   339 Fed. Appx. 216 (3d Cir. Aug. 5, 2009) .........................................22, 23

*Noble v. Porsche Cars N. Am., Inc.*,
   694 F. Supp. 2d 333 (D.N.J. 2010) ..........................................................34

*P.V. ex rel. T.V. v. Camp Jaycee*,
   197 N.J. 132, 135-36 (N.J. 2008) ......................................................passim

*Payne v. Fujifilm U.S.A., Inc.*,
   2007 U.S. Dist. LEXIS 94765 (D.N.J. Dec. 28, 2007) .............................34

*Perkins v. DaimlerChrysler Corp.*,
   383 N.J. Super. 99 (App. Div. 2006) ...................................................33, 34

*Real v. Radin Wheels, Inc.*, 1
   98 N.J. 511 (N.J. 2009) .............................................................................30

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   ___ U.S. ___, 130 S. Ct. 1431 (2010) .....................................................20

*Smith v. Alza Corp.*,
   400 N.J. Super. 529 (N.J. App. Div. 2008) .............................................32

*Strawn v. Canuso*,
   140 N.J. 43 (1995) ....................................................................................39

*Tucker v. Bernzomatic*,
   2010 U.S. Dist. LEXIS 43771  (E.D. Pa. May 4, 2010) ...........................34

*Veazey v. Doremus*,
   103 N.J. 244 (N.J. 1986) ..........................................................................19

*Warriner v. Stanton*,
   475 F.2d 497 (3d Cir. 2007) ............................................28, 29, 31, 33

*White v. Smith*,
   398 F. Supp. 130 (D.N.J.1975) .................................................................24

## **Statutes** !

N.J.S.A. § 56:8-2 - 20 ("CFA") .................................................................passim

N.Y. C.P.L.R. § 901(b).................................................................................20

S.C. Code § 39-5-140(a)..............................................................................20

## **Other Authorities** !

*Restatement (Second) of Conflict of Laws* § 6 (1971) ................................. 28-30

*Restatement (Second) of Conflict of Laws* § 145 (1971) ............................ 28-30

*Restatement (Second) of Conflict of Laws* § 146 (1971) ................................26

*Restatement (Second) of Conflict of Laws* § 147 (1971) ................................26

*Restatement (Second) of Conflict of Laws* § 148 (1971) ...........................passim

## I.   INTRODUCTION

When Plaintiffs Mark Maniscalco and Walter Huryk bought BHL2 series Brother Multi-Function Centre ("MFC") machines, they were unaware that Defendant Brother International Corporation (USA) ("BIC") had concealed that their machines suffered from two design defects:

- one that causes their print heads to fail (and to display the message "MACHINE ERROR 41") well before their expected useful life of five years or printing 50,000 pages (the "ME41 defect"); and

- another that causes BHL2 series MFC machines to purge ink so frequently —as much as *700 percent* more than non-defective machines—that their ink cartridges can empty themselves within six months *even if the user does not print a single page* (the "ink-purging defect").

Both Plaintiffs' experiences were similar, in that their machines seemed to consume ink incessantly, using substantially more ink than other printers they had purchased and in total disproportion to their printing.   But it wasn't until their machines stopped functioning altogether as a result of print head failure caused by the ME41 defect (well before the end of their useful lives) that they began to learn that others—*many* others—were experiencing the same problems.   Like them, consumers were complaining about the inordinate amounts of ink that the machines used, that the machines appeared to "self-clean" far more often than other machines, and that their ink cartridges contained substantial amounts of ink even though the machines displayed "INK EMPTY" on their LCD panels.

Plaintiffs brought this lawsuit to rectify the problem.   Since then, Plaintiffs have learned that each of them had unknowingly bought Brother MFC machines at a time when BIC was selling 100% of them (with the exception of a few machines designed exclusively for hotels) with defective software that causes the ink-purging defect.   Plaintiffs have also obtained hundreds of thousands of internal

documents from BIC, which confirm that BIC became aware of the ME41 defect shortly after it began marketing and selling affected machines in August-September 2001, but that it continued to sell them to unsuspecting consumers while the ME41 defect caused hundreds of thousands of machines to stop functioning after their 90-day warranty expired, but well before the end of their useful life.

Internal documents also confirm that the ink-purging defect is another huge problem—one that had BIC and its corporate parent, Brother Industries, Ltd. ("BIL"), scrambling to find a solution—while continuing to sell the machines to consumers without saying a word about the defect.  The technical documents that Plaintiffs hoped would shine a light on the false "ink empty" problem were another matter.  BIC refused to produce those documents on the ground that they were in BIL's possession, forcing Plaintiffs to move to compel their production.  Because that motion was ultimately denied, Plaintiffs were unable to move forward with the false "ink empty" claim, and focused their efforts on the ME41 and ink-purging defects instead.  Thus, they have elected not to oppose the dismissal of their false ink-empty claims.  *See* TAC ¶¶ 23-39 (describing claims in question).

By this motion, BIC purports to move for summary judgment of Plaintiffs' entire Third Amended Complaint ("TAC"), yet neither the notice of motion nor BIC's opening brief even mention (much less dispose of) the ink-purging defect.  Instead, the motion navigates around that claim, touches upon the ME41 defect, and devotes the bulk of its brief in ***this*** case arguing against the claims that the *McFadden* Plaintiffs are pursuing.

There are two problems with that approach.  First, the *McFadden* Plaintiffs claim that BIC violated the New Jersey Consumer Fraud Act ("CFA") simply by

preventing them from using the substantial amount of ink that remains in the machines' ink cartridges after they display "ink empty." Plaintiffs also alleged that the machines displayed "ink empty" when ink remained in the cartridges, but the primary focus of their "ink empty" claim was that BIC sold machines that were designed to use excessive amounts of ink (as opposed to merely registering that ink cartridges are empty when they were not) while coercing consumers to buy expensive replacement cartridges only from BIC. Second, because the *Maniscalco* Plaintiffs have been unable to obtain the evidence needed to prosecute these claims, they do not oppose the dismissal of their false "ink empty" claim.

Because BIC has chosen to ignore the ink-purging claim and Plaintiffs do not oppose dismissal of the "ink empty" claim, the primary focus of this opposition brief is on the ME41-related claim. BIC moved to dismiss that claim last year, contending that Plaintiffs had not alleged ascertainable loss and that BIC had no duty to disclose the defect in any event. The Court disagreed, and declined to dismiss the ME41 claim. Now, BIC contends that the ME41 claim must be dismissed because New Jersey law does not apply to it. Alternatively, BIC attempts to resuscitate its ascertainable-loss and lack-of-duty arguments.

In actuality, however, New Jersey has the most significant relationship to Plaintiffs' claims because it is where BIC executives and other BIC personnel conceived, orchestrated, and engaged in all of the fraudulent conduct that led to this lawsuit. Moreover, BIC relies on the same legal authority it cited last time concerning its ascertainable loss theory, so all that's changed since the Court denied BIC's motion to dismiss the ME41 claims is that Plaintiffs now have evidence that supports each and every allegation on which their claims are based. Accordingly, this motion should be denied.

## II.    SUMMARY OF PERTINENT FACTS

### A.    THE ME41 DEFECT

A printer needs a functional print head to be able to produce images. Before the year 2000, the print heads that were used in the MFC machines BIC marketed and sold throughout the United States were considered "consumable accessories" because they needed "periodic replacement." *Maniscalco* Plaintiffs' Response to Defendant's Separate Statement of Material Facts Not In Dispute ("Response") (incorporated herein) at 8-9, 33-34. As a consumable, those print heads were covered by BIC's 90-day accessory warranty. *Id.* The MFC machines at issue in the present case are "machine components," hence "***they are expected to last the life of the machine***" and are entitled to coverage under the one-year warranty that applies to machine components. *Id.* (emphasis added). The expected useful life of the MFC machines at issue in this litigation is five years or 50,000 pages of printed material. *Id; Maniscalco* Plaintiffs' Supplemental Statement of Disputed Material Facts ("Disp. Facts") (incorporated herein) ¶ 2.[1]

In August-September 2001, BIC began selling MFC and fax machines equipped with defective print heads that prematurely failed by the hundreds of thousands due to the ME41 defect, which causes the machines in which those print

---

[1] Notwithstanding that print heads are "part of the printer itself, not a consumable replaceable," ***BIC*** (not BIL) made the decision to falsely describe, in the machines' user manuals, the print heads installed in those machines as "consumables" that are subject to the 90-day consumables warranty, as opposed to the one-year warranty that covers machine parts. Response at 34. BIC did so to enable it to deny warranty claims by invoking the 90-day warranty at its discretion. *Id.* While BIC claims it would "basically honor" the one-year warranty, it admits it did so only for consumers who happened to call BIC and get into that discussion. *Id.* Yet ***BIC specifically told consumers searching for information about the ME41 defect on its website that they should only call BIC if they received the ME41 error code while their machines were still in warranty*** (*i.e.*, 90 days). *Id.*

---

heads are installed to display a Machine Error 41 ("ME41") error message and to stop printing until the print heads are replaced. *E.g.*, Disp. Facts ¶¶ 1-72, 169-187. In the words of Charles Stadler, BIC's Vice President of Customer Service and the only witness BIC designated to testify on its behalf about the issues relating to Plaintiffs' claims pursuant to Rule 30(b)(6), the number of machines that failed as a result of the ME41 defect was "catastrophic." *Id.* ¶¶ 60-61.[2]

The ME41 defect began causing Affected Machines to fail almost immediately after the first machines were sold in 2001, and the failure rate continued to mount from year to year. *E.g., id.* ¶¶ 15-72, 169-187. By June 2002, the ME41 problem had gotten so bad that it was discussed in BIC's "June 2002 Quality Issue Review" and BIC's New Jersey Technical Support team had launched an investigation. *Id.* ¶ 21-22. By June 2002, BIC was swapping a dozen machines *in a single month* as a result of the ME41 defect. *Id.* ¶ 32.[3] To put this number in perspective, to BIC, "*as few as two swaps in a single quarter can be deemed "too many" and "three or four is really big.*" *Id.* ¶¶ 16-18 (emphasis supplied). Despite the fact that, in a single month, BIC was swapping six times the number of machines it considers "too many" if those swaps occurred over an entire quarter, BIC's Technical Support team decided to wait until it could recreate the problem itself before requesting that BIL launch a formal investigation. *Id.* ¶ 22-

---

[2] Since 2002, Mr. Stadler has served as BIC's Vice President of National Service at BIC's New Jersey headquarters, and is responsible for customer service, technical support, parts distribution, and repair within the service sector known as "business machine products and home sewing machines." Response at 3-4.

[3] "Swap" means to exchange an MFC machine for a new or a refurbished machine. *Id.* ¶ 16.

27. That did not happen until August 2002, at which time BIC finally prepared the first of several Fault Reports pertaining to the ME41 defect. *Id.* ¶ 27.[4]

In March 2003, BIC closed the first Fault Report and opened a second. *Id.* ¶¶ 41-47. Comments from BIC personnel in the United States and from Brother affiliates all over the world were attached to the August 2002 and the March 2003 Fault Reports, confirming that the ME41 defect was not only an ongoing problem throughout this period, it was escalating—*and no one knew how to solve it*. *Id.* ¶¶ 27-46. In short, BIC considered ME41 failures to be a "big problem that we need a solution for." *Id.* ¶ 38.                                    REDACTED

REDACTED              *Id.* ¶ 39. In June 2003, BIC closed the second ME41 Fault Report without fixing the problem. *Id.* ¶ 47. And on November 11, 2003—one month before Mr. Huryk purchased his BHL2 MFC 3220C—BIC created a *third* Fault Report, specifically for the BHL2 series. *Id.* ¶¶ 48-49. By the time Mr. Huryk bought his machine in December 2003, there was no doubt that BIC knew the ME41 defect was a big problem; it just couldn't figure out what was causing it. *Id.*[5] By January 2004, BIC was reporting that ME41 failures had "grown progressively worse without a solution." Ex. 63 at 2, 1st row (re BHL).

---

[4] A "Fault Report" is the method by which BIC formally advises and communicates with BIL about "quality issues or customer calls" that BIC receives[,]" so as to trigger an investigation by BIL. *Id.* ¶¶ 23-25, 29. The first two Fault Reports were prepared by Henry Ortega, the New Jersey-based Product Support Specialist for the BHL machines at that time. *Id.* ¶¶ 28, 43. The comments attached to both Fault Reports show Mr. Ortega played an active role in the investigation at issue in those reports, which was a joint effort by BIC and BIL. *E.g.*, *id.* ¶¶ 27-47 & Exs. 8 & 53.

[5] Although BIC did not know the specific *cause* of the ME41 defect when it first became aware of the problem, BIC understood that when Affected Machines displayed the ME41 error message it meant that their print heads were not functioning either intermittently or permanently, and that their print heads had to be replaced. *Id.* ¶¶ 1-9. As discussed below, it took several more years before BIL

REDACTED

*Id.* ¶ 70.  Moreover, the "defect rate" continued to soar because the steps that had been taken to try to contain it (such as redesigning the print head) had "not shown to be very effective in reducing swaps." *E.g., id.* ¶¶ 69-72.  In May 2004—one month before Mr. Maniscalco bought his machine—BIL advised BIC that that it discovered the cause of the ME41 defect, but did not know how to fix it.  *Id.* ¶ 56.  In July 2004, BIL indicated it would begin producing modified print heads as of August 2004, but admitted (to BIC) that the best it could do was "pray[]" the redesigned print heads "will be good." *Id.* ¶ 71.  Predictably, they were not.  *Id.* ¶ 72.

BIC continued to market and sell the Affected Machines even though BIC had the discretion to put a hold on selling defective products until a correction for the defect was available. *Id.* ¶ 193.  Instead of doing so, BIC focused its efforts on containing an outcry about the problems that the ME41 defect was causing for consumers by providing the most persistent (and most vocal) customers with additional warranty coverage (*i.e.,* one year instead of 90 days) as a means of silencing them when those customers took the time to complain to BIC.  *Id.* at ¶¶ 73-78.[6]  As it became apparent that Affected Machines were failing after the one-

---

discovered that          **REDACTED**
    and developed a solution that eliminated the ME41 defect.  *Id.* ¶¶ 51-55. Meanwhile, BIC continued to market and sell the Affected Machines from its New Jersey headquarters *see* Response at 2-6 (discussing, *inter alia,* marketing and sales activities emanating from NJ),without disclosing the existence of the ME41 defect, *e.g., id.* ¶ 58.
    [6]

REDACTED

year warranty expired, BIC increased the secret warranty coverage (for the ME41 defect only) to 15 months from purchase or, for those who lacked proof of purchase, 18 months from the date of manufacture. *Id.* at ¶ 79-80.

Nonetheless, Mr. Stadler testified that BIC decided to refrain from announcing the availability of this additional warranty coverage publicly; instead, BIC deliberately left it to the discretion of its customer service representatives ("CSRs") to offer the coverage to certain customers "depending upon customer situations." *Id.* ¶ 81-82.[7]  Because the availability of the various warranty policies were purposefully discretionary, there was no uniformity as to how or when BIC offered the extra coverage. *Id.*  ¶¶ 90-93.  Mr. Stadler wrote about this in an e-mail message dated February 23, 2005, in which he described examples of persons who had been turned away.  One customer

> had purchased 27 machines (2 yrs. ago) and had *25* replaced. . . . *She was most upset because one time she was told we extended the warranty to 18 months so she swapped two machines for ME41. When she called back months later, with 2 more ME41 she was told that we took back the extended warranty and now it is back to 12 months.*
> She then told me that the managers in the field could no longer rely on their Brother machines. *This year someone gave it as a gag gift for Christmas.  They put it in the middle of the room and hit it with a bat.  She said that was satisfaction for them*. . . .

*Id.* ¶ 92 (emphasis added).

---

REDACTED

*Id.*

¶ 107.

[7]  BIC did, however, make sure it told BIL what it planned to do, and demanded "warranty reimbursement and a no-cost print head from BIL" to compensate BIC for warranty expenses.   BIL reimbursed BIC for certain ME41-related warranty expenses          REDACTED                    "because of the high percentage of defects." *Id.* ¶¶ 83-84, Ex. 10 at BROTHER2450991.

By early 2005, BIC recognized that the likelihood of someone filing a class action to seek redress for the ME41 defect was high.  *Id.* ¶¶ 88, 121.   BIL considered recalling all Affected Machines, but Mr. Stadler made sure BIC did "all we [could] to convince them not to have the recall" because Mr. Stadler was concerned about "public perception of the recall at that time" and because of the increase in burden and cost a recall would have imposed on BIC. *Id.* ¶¶ 144-148.[8]

Instead of recalling the Affected Machines, in February 2005 BIC implemented an official 24-month warranty extension to give it something to point to as a defense in the event a class action such as this one was filed, while doing so in a manner that was deliberately calculated to ensure notice of the warranty reached as few people as possible. *See id.* ¶¶ 94-143.[9]  BIC's efforts in that regard included limiting the number of notices it sent to registered owners of Affected Machines and posting so-called "notice" of the extended warranty on its website in a way that would minimize the likelihood that anyone would find it. *Id.* ¶¶ 113-

---

[8] Before extending the warranty in February 2005, BIC was "barely keeping up with the demand for print heads." *Id.* ¶ 118. Even with the minimal public notice of the ME41 warranty extension, claims spiked dramatically following its implementation. *Id.* ¶ 63. BIC claims, in responses to interrogatories, that it ultimately swapped REDACTED Affected Machines and paid to repair an additional REDACTED Affected Machines under warranty as a result of ME41, which is approximately REDACTED of the number of Affected Machines BIC sold. *Id.* ¶ 183-187. But the REDACTED failure rate does not take into account all of the machines that consumers paid to repair or replace outside of warranty. *See id.* To put the REDACTED failure rate into perspective, in 2005, Mr. Stadler characterized a swap/warranty rate of approximately REDACTED as a "catastrophic quality issue" "because of the percentage of failure." *Id.* ¶¶ 60-61.

[9] Mr. Stadler offered multiple conflicting reasons to explain how BIC selected the durations for its unannounced and its official ME41 warranty extensions. *Id.* at ¶¶ 97-108. Ultimately, Mr. Stadler candidly acknowledged that, even with the implementation of the 24-month extended warranty he is "sure that there will be many customers that we won't be able to satisfy." *Id.* 96.

---

143.  Indeed, Mr. Stadler initially recommended against sending out *any* notice at all because so "[m]any customers that were out of warranty prior to the extension of the warranty for ME41 had already paid for the replacement of the print head or have gone out and purchased a new product."  *Id.* ¶ 119.

In addition to limiting the mailed notice, Mr. Stadler deliberately buried the so-called "announcement" of the 24-month extended warranty "three layers off the opening page" of its website.  *Id.* ¶ 132.  The ME41 warranty information was so difficult to locate that an employee of BIC Mexico had to write to Mr. Stadler for instructions about how he could retrieve it.  *Id.* ¶ 135-136.  BIC also sought to "bury" the ME41 extended-warranty "announcement" by posting information about new product releases on the website at the same time "so there's not as much attention to the extended warranty announcement."  *Id.* ¶¶ 121-131.  Mr. Stadler conceded that the plan (which he devised) would have diluted the impact on the people BIC was ostensibly trying to notify about the ME41 extended warranty.  *Id.* ¶ 124.  Although Mr. Stadler suggested BIC may not have gone through with the plan, the evidence indicates it did.  *Id.* ¶¶ 130-131, 133-134.

At the same time BIC sought to dissuade BIL from conducting a recall of the Affected Machines for ordinary consumers like Mr. Huryk and Mr. Maniscalco, Mr. Stadler orchestrated a program that was tantamount to a recall for certain corporate customers, pursuant to which BIC proactively notified them to bring back their Affected Machines prior to the manifestation of the ME41 defect so those machines could either be swapped, or so that their print heads could be replaced.  *Id.* ¶¶ 144-154.  BIC also found a way to exploit the ME41 defect to its advantage.  After deciding to extend the warranty on the Affected Machines, Mr. Stadler advised Authorized Service Center ("ASC") personnel to persuade

customers that *they* may have caused print-head failure by using non-OEM ink in their MFC machines, even though BIC knew that was not true. *Id.* ¶ 11-14. Then, BIC would offer to fix their print heads anyway, thereby hopefully causing the unsuspecting customers to believe BIC was their "hero." *Id.*

## B.   THE INK-PURGING DEFECT

In addition to being sold with defective print heads, all but a small fraction of the machines in the BHL2 series (the machines Plaintiffs bought) were sold with a software defect that causes them to repeatedly purge so much ink that those machines can literally empty their ink cartridges without the owners printing a single page (the "ink-purging defect"). Response at 22-25, 31-32, 41-44. BIC has never told BHL2 owners about the existence or nature of the ink-purging defect. *E.g.*, Disp. Facts ¶ 190.__The nature of the defect is such that, the less frequently the machines are used, the more ink the machines consume. Mr. Stadler described the defect as

> a bug that causes the unit to purge every 4 days when no printing occurs. If the product is not being used, all color will purge every 4 days or if someone is only printing in black, the color cartridges will purge every 4 days. It's supposed to purge every 30 days and a cartridge should last 1 to 2 years with very low volume printing. However, with this firmware bug low volume printing a cartridge will last only 6 to 7 months.

> If the customer prints everyday, but not on the weekend, the cartridge will last 10 months. Printing everyday including weekend, the cartridge will last as the specification.

Response at 22-23.[10]

---

[10] Software is also referred to in BIC's documents as ROM and firmware. The models affected by the ink-purging defect in the U.S. are the MFC3220C, the MFC3420C, the MFC3820CN, the MFC3320CN, the FAX1820C, and the FAX1920C. Response at 22 & n. 5.

In August 2004, BIC's New Zealand counterpart opened a Fault Report to launch an investigation into the cause of the ink-purging defect. Response at 23-24. The Fault Report states that "machines are purging ink too often and emptying all the ink cartridges within 7 months or less, but the specifications found with the MFC 3220C service manual states that the ink should last 20 month plus on color and 15 months mono based on purging only." *Id.* at 23. The Fault Report goes on to state that "[w]orst cases have included the machine cleaning the inks to the point of coming up empty without the End User printing a single page!" *Id.* (exclamation point in original).

Mr. Maniscalco unknowingly experienced the effects of the ink-purging defect shortly after he purchased his BHL2 machine. As Mr. Maniscalco testified, during the first few months he owned that machine, he was busy with a project and hardly used it. *Id.* at 27. Notwithstanding that he had printed just a few pages (50 at most) "the darn thing emptied out and required me to put ink cartridges in before I had even printed – there was just a few pages printed." *Id* & McDonald Decl., Ex. 3 at 208:20-209:11.[11]

Although BIC does not seek summary judgment of Plaintiffs' ink-purging defect claims, BIC does (in the context of seeking summary judgment of the false "ink empty" claims the *Maniscalco* Plaintiffs are no longer pursuing) emphasize its

---

[11] According to a test conducted by the author of the August 2004 Fault Report, the ink-purging defect caused the BHL2 machine to consume twice as much ink as the non-BHL2 machine. Response at 43-44. Mr. Stadler explained, that, short of learning about and installing the modified software BIC eventually (albeit quietly) made available (see below), the only way the owner of a BHL2 machine could avoid the effects of the ink-purging defect was by printing every single day of the week, including weekends. Disp. Facts ¶ 249. BIC never provided that information to BHL2 owners. Disp. Facts ¶ ¶ 190, 243, 253.

so-called disclaimer that "'[t]he machine periodically cleans the print head during an automatic self-cleaning process.   This process consumes a small amount of ink.'"   Brief in Support of Defendant Brother Int'l Corp.'s Motion for Summary Judgment ("OB") at 25.   Whatever relevance that disclaimer may have elsewhere, in the context of *this* case, the so-called disclaimer is further evidence of BIC's effort to conceal the existence of the ink-purging defect:  As Mr. Stadler testified, a defect that can cause a BHL2 machine to purge so much ink that it can literally drain all four cartridges within a six-month period without the user printing a single page is not using a "small amount of ink."  Response at 31-32.  Nor does the ink-purging defect cause BHL2 machines to drain ink for the purpose of maintaining "quality."  *Id.*  To the contrary, these machines purge ink excessively because their software is defective.  *Id.*

According to an e-mail message Mr. Stadler wrote on September 27, 2004, "100% of all the BHL2 products that have been shipping have the 'defective' ROM, causing the excess purging of ink and creating a false ink empty message." *Id.* at 24.  Of the nearly 500,000 BHL2 machines BIC sold in the United States, only a fraction of them were *not* sold with defective software.  *Id.* at 22 n. 5.  That fraction includes BHL2 machines sold only to hotels for use in guest rooms.  *Id.* at 24.  In September of 2004, BIL introduced modified software intended to address the ink-purging defect.  Disp. Facts ¶ 198.  On or about September 21, 2004, BIC conducted a test to quantify the difference in ink consumption between BHL2 machines with and without the defective software.  *Id.* ¶¶ 199-210.  Initially, the purpose of the test was to explain the difference in terms consumers could understand.  *Id.* ¶ 199.  Ultimately, however, BIC decided not to say anything to consumers about the defect, much less highlight the difference in ink consumption.

*E.g., id.* ¶¶ 190, 215-221.  The test showed that, "at 5% percent coverage, an[] additional 29 pages can be printed out with the new ROM version after six days of use." *Id.* ¶¶ 200-202.  Mr. Stadler confirmed that tests showed the modified software "used a lot less ink" than the defective software. *Id.* ¶¶ 211-214.[12]

Rather than advising consumers about the ink-purging defect and the need to upgrade the software on their BHL2 machines to eliminate it, BIC took affirmative steps to conceal the existence of the ink-purging defect because it knew that "problems have a tendency to be published on the internet, taking the control away from us." *Id.* ¶ 215 & Ex. 27 at BROTHER1905420.  Accordingly, once BIC had the modified software, Mr. Stadler and his group planned how to get BHL2 owners to install it without letting them know that their machines are defective. *Id.* ¶¶ 215-248.  For example, in September 2004, Mr. Stadler wrote that "we still have to determine how we can implement this improvement so that it does not appear that we are correcting a design problem and minimize what could be a very expensive upgrade program." *Id.* ¶¶ 215.  Mr. Stadler acknowledged that any option that

---

[12] BIL also quantified the effects of the ink-purging defect.  It did so by comparing the amount of time ink cartridges would last in BHL2 machines equipped with the defective software vs. BHL2 machines equipped with the modified. Response at 44.

Mr. Stadler testified that, if a BHL2 machine equipped with the defective software and a BHL2 machine equipped with the modified were left to sit for seven months the BHL2 machine with the defective software would likely have emptied its four ink cartridges, resulting in no pages printed.  Response at 31-32, 43-44. The same would be true after six months.  *Id.*  While Mr. Stadler initially testified that, after seven months of nonuse, the BHL2 machine with the ***modified*** software would also not print close to 500 or even 250 pages, he later testified that "it is possible that [the non-defective] machine could still print 500 pages at 5% coverage after that period of non-use." *Id.* at 43.  Additionally, Mr. Stadler testified that, at the end of six or seven months of nonuse, a BHL2 machine equipped with the defective software would have consumed more than seven times more ink, an amount Mr. Stadler admitted was substantial. *Id.*

involved BIC proactively installing the modified software in every BHL2 machine sold to that point would not only cost "a staggering amount of money" (the cheapest option would cost over REDACTED    but BIC could not "practically manage this program" in any event, because it did not have enough "service centers, swaps, or time." *Id.* & Ex. 27 at BROTHER1905420.[13]

To avoid this expense, BIC decided to try to "quietly resolve the issue," so as to "prevent any public outcry of how Brother has wasted the consumer's ink to increase their sales or any class action." *Id.* ¶ 217.  As a result, BIC decided against notifying BHL2 owners who had registered their machines with BIC of the availability of the modified software, notwithstanding that Mr. Stadler was well aware that BIC had an obligation to "proactively deal with this issue." *Id.* ¶¶ 216-221.[14]  Mr. Stadler testified that, if BIC *had* sent notice of the availability of the modified software to registered BHL2 owners, the claims rate would likely have increased, just as it did when BIC eventually sent notice of the ME41 extended warranty to registered users. *Id.* ¶ 221.

While BIC gave the modified software to its ASCs in September, BIC did not make the modified software available for BHL2 owners to install themselves

_____

[13] BHL2 owners could not prevent their machines from purging excessive quantities of ink by turning them off, because the machines are designed to purge even when turned off. *Id.* ¶¶ 257-261.  Likewise, BHL2 owners could not unplug their machines to save ink because, eventually, leaving their machine unplugged would damage the print heads.  *Id.*  Nor could BHL2 owners prevent their machines from purging excessive amounts of color ink by printing in grayscale. *Id.*  Indeed, grayscale exacerbated the defect. *Id.*  Mr. Maniscalco testified that he used the grayscale feature whenever he printed in black and white because he believed that doing so would reduce his consumption of color ink. *Id.* ¶ 261.

[14] Although BIC considered notifying registered users, and even went so far as to draft the notice, BIC ultimately decided not to send that notice. *Id.* ¶¶ 244-248.

until March 2005, and then only if they took the initiative to call BIC's CSRs to complain about their ink consumption.  *Id.* ¶ 218.  To prevent CSRs from inadvertently disclosing the existence of the ink-purging defect, BIC deliberately "did not provide them with information to explain to the customer that it was a defect." *Id.* ¶ 228.  In keeping with the plan to conceal the existence of the ink-purging defect, BIC never drafted a single Solution to specifically address it. *Id.* ¶¶ 229-230.

BIC adopted the same deceptive approach when it finally decided to post the modified software to its website in June 2005, nine months after it became available.  Consistent with the plan to conceal the existence of the ink-purging defect so that it did not catch fire on the internet, Mr. Stadler and his group discussed how to describe the software on its website in a way that did not reveal the existence of a defect. *Id.* ¶¶ 219-243.  For example, BIC deliberately refused to use the word "purging" or "defect," describing the modified software's purpose as "improved ink management" instead, even though Mr. Stadler conceded that, internally, BIC used words like "problem" and "defect" to describe the issue with the BHL2 machines. *Id.* ¶¶ 223-224.  Notably, while the Solutions BIC gave to its CSRs instruct them to tell BHL2 owners who happen to call about the availability of the modified software, the Solutions BIC posted to its website to address questions internet users have about ink consumption do not say anything about the availability of the modified software—although BIC's Technical Support Manager, Michelle Clouse, concedes that they should. *Id.* ¶¶ 223-243.

### C.   PLAINTIFFS' EXPERIENCE WITH THEIR MFC MACHINES

Plaintiffs Mark Maniscalco and Walt Huryk both had similar experiences with their MFC machines.  Response at 26-28.  Both Plaintiffs bought MFC3220C

machines before the modified software that eliminated the ink-purging defect was installed. McDonald Decl. Ex. 3 (Huryk Dep.) at 76:3-6, 98:20-99:10 (machine bought in December of 2003); McDonald Ex. 1 (Maniscalco Dep.) at 169:11-20 (machine bought in June of 2004). *See also* Fu Decl. at ¶ 6 (noting Maniscalco's firmware series is "G0309181900," which is among those that requires the firmware upgrade). Both observed excess purging and promptings to replace ink disproportionate to their printing. *See, e.g.*, McDonald Decl., Ex. 3 (Huryk Dep.) at 121:9-124:3 (testifying the he in the three years his BIC machine worked, he was prompted to replace ink cartridges about 80-100 times, with him replacing the cartridges about half the time); McDonald Decl., Ex. 1 (Maniscalco Dep.) at 101:12-103:1; 143:21-145:14) (discussing frequency of cleaning and ink used compared to printing); Fu Decl. ¶ 5 (reciting information from Mr. Maniscalco's equipment log that showed 1,491 pages printed over three years, with cartridges replaced 37 times). Both suffered the ME41 defect before 5 years or 50,000 pages. McDonald Ex. 3 (Huryk Dep.) at 141:18–159:20; Fu Decl. ¶ 5 (showing most recent error in Maniscalco' machine's equipment log to be ME41); McDonald Ex. 1 (Maniscalco Dep.) at 54:20-56:25 (Maniscalco's machine (Ex. 9) turned on at his deposition, displaying "Machine Error 41"). Neither Plaintiff knew about the ME41 defect or the ink-purging defect before purchasing their MFC machines. McDonald Decl. Ex. 3, (Huryk Dep.) at 63:20-25; 253:5-9; McDonald Decl. Ex. 4 (Huryk Interrog. Resp. at 4-7); McDonald Decl., Ex. 1 (Maniscalco Dep.) at 198:25-201:3).

## III.   ARGUMENT

### A.   BIC'S FAILURE TO ADDRESS THE INK-PURGING DEFECT IN ITS MOTION PRECLUDES SUMMARY JUDGMENT

BIC contends that it is entitled to summary judgment of Plaintiffs' Third

Amended Complaint in its entirety. *See* BIC's Notice of Motion for Summary Judgment at 2; OB at 3-40. Yet BIC has not even addressed Plaintiffs' ink-purging defect claim notwithstanding that the operative Complaint clearly alleges three distinct, independent bases for BIC's liability in this action. *See* TAC ¶¶ 23-39 (describing factual bases for false "ink empty" claim); *id.* ¶¶ 40-51 (describing the ink-purging defect, and BIC's failure to disclose the defect to Plaintiffs and the proposed class); *id.* ¶¶ 52-87 (describing factual bases for claim that BIC failed to disclose ME41 defect). Thus, BIC's motion includes *no* evidence, analysis, argument, or even a passing mention of the ink-purging claim.[15]

Having failed to address fully one-third of the claims alleged in the TAC, BIC cannot obtain dismissal of the TAC for that reason alone—and it cannot cure that problem by offering evidence or argument on reply. *E.g., Fountain v. Filson,* 336 U.S. 681, 682-83 (1949) (reversing order granting summary judgment based on issue non-moving party had no opportunity to address); *Laborers' Int'l Union v. Foster Wheeler Corp.,* 26 F.3d 375, 398 (3d Cir. N.J. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing

---

[15] BIC uses the word "purge" (or a variant of that word) a total of three times in its 40-page brief, and each time it uses it to describe the self-cleaning process that pertains to the false "ink empty" claim. *See* OB at 17, 19-20. There is *no* discussion *anywhere* in BIC's notice of motion, in its opening brief, or in its separate statement of (purportedly) undisputed facts about the ink-purging defect. This is so despite the fact that BIC has unequivocally admitted the existence of the ink-purging defect, that it is caused by a "software bug" that affects all but a small fraction of the BHL2 series of MFC Machines BIC sold, and that BIC never disclosed the existence of the defect to Plaintiffs or to the class of consumers they propose to represent. *See* Response at 22-28; Disp. Facts ¶¶ 190-193, 215-248.

Instead, BIC focuses this motion exclusively on Plaintiffs' other two CFA claims—the one based on the false "ink empty" claim that Plaintiffs are no longer prosecuting, *see* TAC ¶¶ 23-39 (describing factual bases for false "ink empty" claim), and the one based on the ME41 defect, *see id.* ¶¶ 52-87 (describing factual bases for ME41 claim).

---

reference to an issue . . . will not suffice to bring that issue before this court") (internal quotation marks and citations omitted); *Bayer AG & Bayer Corp. v. Schein Pharm.*, 129 F. Supp. 2d 705, 716 (D.N.J. 2001) (argument raised for first time on reply must be stricken).

**B.    NEW JERSEY LAW PROVIDES THE RULES OF DECISION**

A federal court presiding over a diversity action must apply the forum state's conflicts of law rules. *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). Although it had been relying on the "most significant relationship" test that was established by the American Law Institute in the *Restatement (Second) of Conflicts of Laws* (1971) (hereinafter, "Restatement") for years, New Jersey formally adopted that test in *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 135-36 (N.J. 2008) ("Although we have traditionally denominated our conflicts approach as a flexible 'governmental interest' analysis, we have continuously resorted to the *Restatement (Second) of Conflict of Laws* (1971) in resolving conflict disputes arising out of tort"). *See also Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998) (the government interest analysis "parallels the 'most significant relationship' test of the *Restatement 2d, of Conflict of Laws*") (citing *Veazey v. Doremus*, 103 N.J. 244, 251 (N.J. 1986)).

The most significant relationship test involves two basic steps. The first step requires a determination of whether a conflict actually exists among the laws of the states involved in the dispute before the court. *Id.* at 143. If not, the analysis ends and the law of the forum state is applied to the dispute. *Id.* If an actual conflict does exist, the analysis proceeds to the second step, which requires the court to determine which state has the most substantial relationship to the dispute. *Id.* Here, Plaintiffs assume for the purposes of this analysis the existence of a conflict

between the CFA and applicable provisions of South Carolina and California law.[16]

As for the rules that govern the second part of the analysis, Restatement sections 6 and 148 provide the guiding principles by which that determination is to be made in cases involving fraud-based claims. *E.g., In re Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 125 (D.N.J. 2010); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 294 (D.N.J. 2009). Here, BIC acknowledges the propriety of applying Section 148; that Section 148(1) is only applicable "when the acts of reliance, the receipt of the false representation, and the making of the false representation all occur in the same state"; and that Section 148(2) applies "'[w]hen the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made . . . .'" OB at 8 (quoting Restatement § 148). "Whether subsection (1) or subsection (2) of Section 148 is applicable thus depends upon where the alleged false representations were made and received." *Arcand*, 673 F. Supp. 2d at 295. The parties disagree, however, on the location of the conduct giving rise to Plaintiffs' concealment claims. BIC contends that its concealment was "directed" at Plaintiffs' home states, OB at 10, but ignores that the concealment was conceived, orchestrated, and executed by BIC executives in BIC's home state, New Jersey.

---

[16] *But see Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, ___ U.S. ___, 130 S. Ct. 1431, 1437-38 (2010) (state statute prohibiting prosecution of claims based on its violation in a class action (*i.e.*, N.Y. C.P.L.R. § 901(b) in *Shady Grove* and S.C. Code § 39-5-140(a) in the present case) has no effect in cases over which federal courts have diversity jurisdiction, where Fed. R. Civ. P. 23 governs); *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 621-22 (C.D. Cal. 2008) (finding no ***material*** difference between California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200-17209, and Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750-1784, and consumer-protection laws of other states and District of Columbia).

### 1.   *Restatement Section 148(1) is Inapplicable to This Case*

BIC contends that Section 148(1) is not only applicable to this case, but that it requires a presumption that the law of Plaintiffs' home states apply because "Plaintiffs' causes of action are based predominantly on BIC's alleged *failure to disclose* information to the Plaintiffs" rather than fraudulent misrepresentations, OB at 9 (emphasis in original), and because "here, clearly, the 'failure to disclose' would have been 'directed at each plaintiff's home state[,]'" *id.* at 10 (citing *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 463 (D.N.J. 2009)).

BIC's argument makes no sense. Material facts that are concealed rather than disclosed are not "directed" anywhere. To the contrary, concealed facts are, by definition, ***withheld*** from those who have a need to know them, and Plaintiffs suffered a loss precisely because BIC made sure that those facts did ***not*** reach them. *See, e.g., In re Collins & Aikman Corp. Sec. Litig.,* 438 F. Supp. 2d 392, 397 (S.D.N.Y. 2006) (stating that, for purposes of determining venue, "it is well settled" that misrepresentations or omissions occur "where the misrepresentations are issued or the truth is withheld, not where the statements at issue are received" and holding that allegedly misleading registration statements occurred at and emanated from company's Las Vegas headquarters, not where they were read by plaintiffs). And, to the extent that BIC contends that its fraudulent omissions were somehow made and received in California and South Carolina, BIC's contention flies in the face of the facts and the plain language of Section 148(1). Subsection (1) applies "[w]hen the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in

reliance took place in the state where the false representations were made and received[.]" Restatement § 148(1).[17]

That did not happen here. Every one of BIC's decisions to conceal what it knew about the ME41 and ink-purging defects were made by people based in its New Jersey headquarters. *E.g.*, Disp. Facts ¶¶ 11-14, 27-28, 35-36, 58, 66-68, 73-78, 81-83, 88-96, 115-168, 188-189, 190, 192-193, 215-248, 253, 255, 260; Response at 29-32. Nor does BIC's reliance on *Agostino* provide support for the notion that Subsection (1) is applicable to a case like this one, where the fraudulent conduct occurred in one state and its impact occurred in another. *See In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 65-66 (D.N.J. 2009) (*Agostino* "relies on an interpretation of the Restatement that is at odds with the plain meaning of Section 148 . . . . In doing so, the Court ignored section 148(2), which applies in cases where the "plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made") (hereinafter "*Mercedes I*").[18]

---

[17] At the same time BIC argues that its fraudulent concealment and Plaintiffs' "reliance" on the concealed facts occurred in a single state, BIC contends that those acts all took place in California *and* in South Carolina, which is a logical impossibility. To make this argument work, BIC must pretend that *all* conduct occurred in *each* of Plaintiffs' home states and that *no* fraudulent conduct took place in New Jersey—even though, as discussed below, BIC contends that its concealment was "directed" at Plaintiffs' home states while ignoring the place *from* which the concealment was "directed": New Jersey.

[18] Mercedes-Benz sought interlocutory review of the decision twice: Once before the Third Circuit issued an unpublished decision in which it discussed *Agostino*—*Nafar v. Hollywood Tanning Sys., Inc.*, 339 Fed. Appx. 216, 221 (3d Cir. Aug. 5, 2009) (on which BIC also relies as ostensible support for the present motion, *see* OB at 5, 7, 10)—and once after *the Nafar* decision issued. *See In re Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 163 (D.N.J. 2010) (hereinafter "*Mercedes II*"). Mercedes also moved to decertify the nationwide class that was certified based on the application of New Jersey law, explaining that the discussion of *Agostino* in an unpublished opinion was not an indication that the

2.   ***Applied as Intended, Restatement Sections 148(2) and 6 Demonstrate That New Jersey Has the Most Significant Relationship to This Dispute***

In addition to improperly applying Section 148(1) to a case that involved conduct that occurred in more than a single state, the *Agostino* court's choice-of-law analysis was skewed by an erroneous assumption that New Jersey had "abandoned" the "flexible governmental interests analysis" in favor of more rigid "choice of law factors" dictated by the most significant relationship test. *See Agostino*, 256 F.R.D. at 461 & n. 11. As the New Jersey Supreme Court stated unequivocally in *Camp Jaycee*, it had **not** "abandoned" the flexibility of the governmental interest analysis; rather, the court explained that the governmental interest analysis was subsumed in the Restatement test and it explicitly rejected the notion that the governmental interest test was "more nuanced" than the most significant relationship test. *See* 197 N.J. at 142 n. 4 ("The question is, more nuanced than what? . . . *[T]he most significant relationship test embodies all of the elements of the governmental interest test plus a series of other factors deemed worthy of consideration.* As a matter of simple logic, the new end point—

___

Third Circuit had adopted the holding in *Agostino*, and that the decision to vacate the district court's ruling and remand for further proceedings in *Nafar* was more likely a function of the fact that the district court's entire choice-of-law analysis in *Nafar* consisted of a single paragraph. *Mercedes II*, 267 F.R.D. at 138-43.

The Third Circuit summarily denied both petitions Mercedes had filed, notwithstanding that Judge Rendell sat on the panels that ruled on *Nafar* and Mercedes's petitions for interlocutory review. *See In re Mercedes-Benz Tele Aid Contract Litig.*, 2009 U.S. App. LEXIS 12478 (3d Cir. June 4, 2009); *In re Mercedes-Benz Tele Aid Contract Litig.*, 2010 U.S. App. LEXIS 8087 (3d Cir. Apr. 19, 2010). Mercedes-Benz then moved for reconsideration of the order denying its motion to decertify the class, and that motion was denied as well. *In re Mercedez-Benz Tele Aid Contract Litig.*, 2010 U.S. Dist. LEXIS 74909 (D.N.J. July 22, 2010).

the most significant relationship test—*is more and not less nuanced than its predecessor*") (emphasis added).

Indeed, the *Camp Jaycee* court began the discussion of the choice-of-law approach it adopted in that case by explaining that New Jersey law had evolved from "the bright line rules embodied in the *Restatement (First) of Conflict of Laws* (1934)[,]" which called for the application of the law of the jurisdiction in which a right had "vested"—such as a tort right "vesting" where the injury, as opposed to the wrongful conduct, occurred. *Camp Jaycee*, 197 N.J. at 138. The wooden, inflexible nature of this approach was the very reason it was rejected:

> Under that system, courts could choose between competing laws simply by applying concepts such as *lex fori*, *lex loci*, and *lex contractus*, **without analyzing the content of the laws, the specific facts of a case, or the contacts the parties may have had with other states**. That approach often resulted in the application of the law of a state with no real connection to the litigation and led to the downfall of the First Restatement.

*Id.* (emphasis added).

Distilled to its essence, BIC's argument is that the location of the purchase of the product controls the choice-of-law analysis. If that were true, the choice-of-law analysis would be meaningless: Courts would mechanically apply the disfavored *lex loci* rule and necessarily apply the law of the state where the purchase occurred. That, however, is precisely the result that New Jersey courts have sought to avoid since abandoning the approach set forth in the First Restatement. *See, e.g., Fu v. Fu*, 160 N.J. 108, 126 (N.J. 1999) ("applying local law of state with numerically greatest contacts would be as mechanical and unjust as automatic application of *lex loci delicti* rule") (citing *White v. Smith*, 398 F. Supp. 130, 134 (D.N.J.1975)).

The *Camp Jaycee* court also observed that, in stark contrast with the First Restatement, the Second Restatement's substantial relationship test "embraced the 'reasoned elaboration' school of judicial analysis that *requires a thorough explanation of every judicial decision, tied closely to the facts of the case, and an articulation of the why the decision is just.*" *Id.* at 139 (emphasis added); *see also id.* at 140 (the approach that informs the substantial relationship test "provide[s] guidance for judges by reminding them of things to consider in making a choice-of-law decision.  The judge then would weigh the factors in light of the facts and explain why she reached the particular result.  *The listed factors certainly do not control the decision; rather, they merely suggest items upon which the judges should reflect*") (internal quotation marks and citation omitted; emphasis added). Thus, as this Court has observed, "[t]he most significant relationship test is a case-by-case, qualitative analysis . . . ." *Arcand*, 673 F. Supp. 2d at 293 (citing *Camp Jaycee*, 197 N.J. at 143).[19]

Applying the factors set forth in Section 148(2)(a) to (f) reveals the importance of the distinction between conducting a qualitative versus a quantitative analysis:  Factors (a), (b), (e), and (f) point to the Plaintiffs' home states, and factors (c) and (d) point to New Jersey, and simply tallying up these

---

[19] *See also Mercedes I*, 257 F.R.D. at 67 ("the 'most significant relationship' test is not a mechanical process in which the Court simply tallies the factors enumerated in the Restatement and applies the law of the jurisdiction supported by the majority of them") (citing *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.2d 455, 467 (3d Cir. 2006), and *David B. Lilly, Inc. v. Fisher*, 18 F.3d 1112, 1119 (3d Cir. 1994)); *International Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co., Inc.*, 384 N.J. Super. 275, 298 (N.J. App. 2006) ("The choice of law analysis is not . . . a simple tabulation of contacts and '[n]o definite rules as to the selection of the applicable law can be stated'") (quoting Restatement § 148, comment j), *rev'd on other grounds*, 192 N.J. 372, 388 n. 3 (N.J. 2007) (expressing "no view on the Appellate Division's choice of law reasoning or the result it reached as to the applicability of our law to all members of a nationwide class").

---

factors would suggest that Plaintiffs' home states have a more significant relationship with Plaintiffs' claims than does New Jersey.   But a qualitative analysis demonstrates that the opposite is true.  *See Mercedes II*, 267 F.R.D. at 125 ("Although four of the six considerations enumerated by Restatement § 148(2) weighed in favor of applying the law of each Plaintiff's home state, the Court held that New Jersey had the 'most significant relationship' to the consumer fraud claims").  There are two basic reasons this is so.

  *First*, not all the factors set forth in Section 148(2) are given equal weight. On one hand, "the place of loss does not play so important a role in the determination of the law governing actions for fraud and misrepresentation as does the place of injury in the case of injuries to persons or tangible things." Restatement § 148, comment c.  *See also Fu*, 160 N.J. at 126 ("The place of injury becomes less important where it is simply fortuitous").   "The place where the defendant made his false representations, on the other hand, is as important a contact in the selection of the law governing actions for fraud and misrepresentation as is the place of the defendant's conduct in the case of injuries to persons or to tangible things."  *Id.*   Therefore, the considerations set forth in Restatement Sections 146 and 147 (which pertain to cases involving personal injuries and property damage, respectively) become part of the Section 148(2) analysis.  *See* Restatement § 148, comment h (the place where the fraudulent representations were made "is as important as, and occupies a position wholly analogous to, the place of conduct that results in injury to persons or to tangible things (see §§ 146, 147)"); *Mercedes II*, 267 F.R.D. at 126 (discussing same).

  Equating the importance of the location in which a defendant engaged in fraudulent conduct with the importance of the location in which a defendant

engaged in conduct that caused personal injury is profoundly significant: The law of the state in which the conduct giving rise to a personal injury occurred is *presumed* to determine the rights and liabilities of the parties, unless "some other state has a more significant relationship under the principles stated in § 6 . . . ." Restatement § 146.   BIC is headquartered in New Jersey, where it markets, distributes, and sells MFC machines and conducts virtually every other aspect of its business.  Response at 2-6.  It is also where Mr. Stadler and other BIC personnel conceived, planned, and orchestrated every act of non-disclosure and suppression of material facts that gave rise to this lawsuit, including, but not limited to the following:

- BIC's marketing and sale of the Affected Machines, Response at 2-6;

- BIC's decision to continue selling Affected Machines from 2001 until a fix for the ME41 defect was finally discovered in June 2005, rather than holding sales or fully disclosing the existence of the ME41 defect prior to purchase, Disp. Facts ¶¶ 19-72;

- BIC's decision to limit the durational limit of the print-head warranty after knowingly selling defective machines, then using the durational limits to unconscionably shift the cost of paying for the ME41 defect to Plaintiffs and the proposed class by refusing to provide them with cost-free replacements of print heads that failed outside the confines of BIC's limited warranty as a result of the ME41 defect, *id.* ¶¶ 73-108;

- BIC's decision to actively conceal the existence, nature, and scope of the ME41 defect from Plaintiffs and the class of consumers they propose to represent as described herein, including but not limited to the following:
  - advertising and selling Affected Machines without disclosing the existence of the ME41 defect, *id.* ¶¶ 58, 89, 120;
  - seeking to mislead consumers into believing they caused ME41 by using generic ink, *id.* ¶¶ 10-14;
  - persuading BIL not to recall Affected Machines, *id.* ¶¶ 144-148;
  - limiting the number of people to whom notice of the extended warranty was sent, *id.* ¶¶ 63, 109-121;
  - posting information about the extended warranty in a manner that was intended to make it difficult to find, *id.* ¶¶ 122-143;
  - enacting numerous, unannounced programs to silence the most vocal

customers as a means of concealing the ME41 defect, including but not limited to proactively replacing print heads for select corporate customers, which refusing to extend the same benefit to consumers, *id.* ¶¶ 81-85, 95, 149-65,

- o seeking out and removing personnel who publicly acknowledged the existence of the ME41 defect, *id.* ¶¶ 188-189;

- BIC's decision to actively conceal the existence, nature, and scope of the ink-purging defect from Plaintiffs and the class of consumers they propose to represent as described herein, including but not limited to the following:
  - o advertising and selling defective BHL2 machines and replacement ink for BHL2 machines without disclosing the ink-purging defect to consumers, Disp. Facts ¶ 190; Response at 14-16, 73, 75-76;
  - o concealing the fact that the ink-purging defect made it impossible for BHL2 machines equipped with the defective software to provide anywhere near the page yields stated in the user manuals and elsewhere, causing Plaintiffs and the proposed class to purchase substantially more costly ink than they would have had to purchase for a non-defective BHL2 machine; deciding not to proactively notify BHL2 owners of the availability of the modified software, Disp. Facts ¶¶ 190-214, 220-221, 245-248; Response at 26-28, 41-44;
  - o delaying posting the modified software to its website for nine months *id.* ¶¶ 219;
  - o disguising the purpose of the modified software so that it did not reveal the existence of the defect (which, in turn, would reduce the likelihood that a consumer would install it), *id.* ¶¶ 215-243;
  - o advising consumers, on the web and in the owner manuals, that the ink purging they experienced was normal and common to all machines, knowing that, in BHL2 machines, the purging was excessive and the product of a defect, *id.* ¶¶ 229-239.

**Second**, "[o]nce the presumptively applicable law is identified, that choice is tested against the contacts detailed in section 145 and the general principles outlined in section 6 of the Second Restatement. If another state has a more significant relationship to the parties or issues, the presumption will be overcome." *Camp Jaycee*, 197 N.J. at 136. *See also Warriner v. Stanton*, 475 F.2d 497, 500 (3d Cir. 2007) (discussing same). "Reduced to their essence, the section 6 principles are: (1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial

Case 3:06-cv-04907-FLW -TJB   Document 126   Filed 01/28/11   Page 35 of 46 PageID: 3438

administration; and (5) the competing interests of the states." *Camp Jaycee,* 197 N.J. at 147 (internal quotation marks and citation omitted).

For this part of the analysis, "the initial focus 'should be on what policies the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether these concerns will be furthered by applying that law to the multi-state situation.'" *Warriner,* 475 F.3d at 500 (quoting *Fu,* 160 N.J. at 125). That leads to a threshold question: Whether the New Jersey legislature intended that the CFA apply to Plaintiffs' claims, notwithstanding that neither Plaintiff is a New Jersey resident. *See* Restatement § 6, comments b, e. That question was answered in the affirmative over a decade ago. *See Boyes,* 27 F. Supp. 2d at 547 ("This court has little doubt that the New Jersey Legislature intended its Consumer Fraud statute to apply to sales made by New Jersey sellers even if the buyer is an out-of-state resident and some aspect of the transaction took place outside of New Jersey . . .") (citations and inner quotation marks omitted).[20] A more recent decision by the New Jersey Supreme Court leaves no doubt that the answer was correct:

> The Consumer Fraud Act (CFA), N.J.S.A 56:8-1 to -20, represents a legislative broadside against unsavory commercial practices. ***In this appeal, where an out-of-state consumer purchased a used automobile from an in-state seller via the internet, we are***

---

[20] *See also Elias v. Ungar's Food Prods.,* 252 F.R.D. 233, 236, 247-48 (D.N.J. 2008) (comprehensive nature of CFA's remedial measures demonstrate that New Jersey has strong interest in applying its law to consumer-fraud claims brought on behalf of nationwide class against New Jersey-based seller, notwithstanding that only named plaintiffs are residents of New York); *Elias v. Ungar's Food Prods.,* 2009 U.S. Dist. LEXIS 74140 (D.N.J. Aug. 20, 2009) (reaffirming original ruling and denying motions for summary judgment and to decertify class based on choice-of-law standard announced in *Camp Jaycee* after original ruling issued).

*called on to determine whether the CFA's reach extends far enough to grasp that transaction. . . .*

We conclude that the Appellate Division's application of the CFA was too narrow. The reach of the CFA's civil cause of action and remedies purposely is broad. By its explicit and unqualified terms, the CFA outlaws "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact . . . in connection with the sale or advertisement of any merchandise or real estate[.]" N.J.S.A. 56:8-2. *In this context, giving full expression to the plain words of that legislative mandate requires that the judgment of the Appellate Division be reversed and the judgment of the trial court be reinstated.*

*Real v. Radin Wheels, Inc.*, 198 N.J. 511, 514-15 (N.J. 2009) (emphasis added).[21]

In reaching this conclusion, the *Real* court noted that the CFA serves to compensate victims, punish the wrongdoer, and eliminate "the scourge of fraud." *Id.* at 520-21. *See also Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 12 (2004) (discussing policies that inform CFA); *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 21 (N.J. 1994) (same). Thus, the first factor in the analysis favors the application of New Jersey law. *See* Restatement § 145, comment e (When a principal purpose of

---

[21] The court's ruling also debunks the notion that New Jersey's interest in applying the CFA to cases involving a New Jersey seller is somehow "attenuated" by the absence of a the New Jersey plaintiff, as the court erroneously assumed in *Knox v. Samsung Elecs. of Am., Inc.*, 2009 U.S. Dist. LEXIS 53685, *6-7 (D.N.J. June 25, 2009), and in *Cooper v. Samsung Elecs. of Am., Inc.*, 2008 U.S. Dist. LEXIS 75810 (D.N.J. Sept. 30, 2008), *aff'd*, 374 Fed. Appx. 250 (3d Cir. 2010). This is why the dissent in *Cooper* is correct. *See* 374 Fed. Appx. at 255-27 (Ambro, J., dissenting in part) (observing "[t]hat the plaintiff is from Arizona, rather than any other state in which these Samsung televisions were sold, is happenstance from Samsung's perspective" and discussing *Boyes, Mercedes I,* and Restatement Sections 6 and 148 to conclude that CFA governs consumer-fraud claims, finding it troubling that majority took only two sentences to conduct its entire choice-of-law analysis). *See also Mercedes II,* 267 F.R.D. at 138-39 (discussing non-precedential nature of unpublished opinions by Third Circuit).

a tort rule "is to deter or punish misconduct, the place where the conduct occurred has peculiar significance").[22]

The next step involves a determination as to whether the application of the CFA would frustrate the policies that inform the consumer-protection laws of other states. *Warriner*, 475 F.3d at 500. It would not. The CFA's provisions for compensatory and mandatory treble damages are fully consistent with all states' interest in compensating its citizens who are victims of fraud. *See, e.g., Elias,* 252 F.R.D. at 247 ("members of the proposed class residing in other states will generally be afforded no less protection under the NJCFA than their home state, and, in fact, may receive greater protection").[23] Moreover, "[w]hile each of the

---

[22] *See also Elias,* 252 F.R.D. at 248 (where conduct alleged to have violated CFA occurred in and emanated from defendant's New Jersey headquarters, "New Jersey's policy of deterring fraudulent conduct by domestic businesses and compensating consumers who are victims of fraud by such business is significantly implicated by this litigation"); *Dal Ponte v. Am. Mort. Express Corp.*, 2006 U.S. Dist. LEXIS 57675, * 21-22 (D.N.J. Aug. 17, 2006) ("New Jersey has the strongest interest in applying its consumer fraud statute, as its policies of deterring fraudulent conduct by domestic businesses and compensating consumers who are victims of fraud by such businesses are significantly implicated by this litigation"); *Clawans v. United States,* 75 F. Supp. 2d 368, 373 (D.N.J. 1999) ("New Jersey has a strong interest in preventing tortious misconduct by its domiciliaries"); *Boyes,* 27 F. Supp. 2d at 547 ("While there can be no doubt that the New Jersey legislature desired to protect its own citizens, it is equally clear that this state has a powerful incentive to insure that local merchants deal fairly with citizens of other states and countries"); *Martinelli v. K-Mart Corp.*, 318 N.J.Super. 554, 565-66 (N.J. App. Div. 1999) (importance of deterrence of tortious conduct by New Jersey residents in choice-of-law analysis); *Butkera v. Hudson River Sloop "Clearwater," Inc.,* 300 N.J. Super. 550, 555 (N.J. App. Div. 1997) ("[T]he defendant's home state has not only a cognizable interest but also the paramount interest in its law being enforced") *Almog v. Israel Travel Advisory Service, Inc.,* 298 N.J. Super. 145, 158 (N.J. App. Div. 1997) ("The goal of our tort law is not only to afford the victim a remedy for a wrong but to deter the resident tortfeasor and others who would commit such wrongs from engaging in that wrongful conduct").

[23] *Dal Ponte,* 2006 U.S. Dist. LEXIS 56775 at *20 ("It appears that none of the non-New Jersey class members would receive less protection under the NJCFA than their home-state consumer fraud statutes, and thus no state's policy of

---

various jurisdictions from which class members will be drawn have an equal interest in compensating their citizens, only New Jersey has the additional interest of regulating a corporation which is headquartered—and allegedly committed the acts in question—within its borders." *Mercedes I*, 257 F.R.D. at 64.

This is so because other states have no legitimate interest in regulating or protecting the interests of entities whose principal place of business are outside of that state's borders. *See, e.g., Gantes v. Kason Corp.*, 145 N.J. 478, 497-98 (N.J. 1996) (New Jersey's policy of deterring tortious conduct by New Jersey manufacturer of defective product represents a substantial interest, and Georgia's interest in protecting businesses from liability is not implicated where defendant is headquartered outside that state); *Smith v. Alza Corp.*, 400 N.J. Super. 529, 546 (N.J. App. Div. 2008) (Alabama has no legitimate interest in applying its law "to a non-resident entity neither incorporated nor operating within its borders").

In short, New Jersey not only has the most significant contacts with the consumer-fraud claims, its interest in the application of its law is overwhelmingly greater than that of Plaintiffs' home states. And the final aspects of the analysis do not alter that fact:

> The remaining two factors—the interests of the parties and judicial administration—are much less significant in the analysis. The protection of the parties' justified expectations, a factor of extreme importance in the field of contracts, ordinarily plays little or no part in a choice-of-law question in the field of torts. This is so because a person who causes an unintentional injury is not necessarily aware of the law that may be applied to the consequences of his actions. In

---

providing protection for its residents will be frustrated"); *Merck*, 384 N.J. Super. at 298 ("All consumer fraud laws in the nation are designed to protect consumers to some degree. 'Their differences do not represent competing or conflicting resolutions of a particular policy issue. Rather [the laws] reflect a legislative determination to attack the same evil'") (quoting *Boyes*, 27 F. Supp. 2d at 548)

addition, to the extent the interests of judicial administration conflict with a strong state policy, that factor must yield.

*Warriner*, 475 F.3d at 500 (citations and internal quotation marks omitted).

### C.    PLAINTIFFS HAVE SUFFERED AN ASCERTAINABLE LOSS

BIC contends that Plaintiffs' claims must be dismissed because they cannot establish they suffered an ascertainable loss. OB at 15-16.[24] According to BIC, it cannot be held accountable for fraudulently concealing the ME41 defect that caused the print heads in both Plaintiffs' MFC machines to permanently cease functioning because "BIC never represented to Plaintiffs that its printers would last five years or 50,000 pages." OB at 26. BIC goes on to argue that Plaintiffs are not entitled to damages for BIC's fraudulent concealment of the ME41 defect because their machines did not fail until after their warranty expired. *Id.* at 27-31 (citing *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99 (App. Div. 2006), and *Duffy v. Samsung Elecs. of Am., Inc.*, 2007 U.S. Dist. LEXIS 14792 (D.N.J. Mar. 2, 2007)).

These are the same arguments—and the same cases that were supposed to have supported them—that BIC made the last time it sought dismissal of Plaintiffs' ME41 claims. They are no better now than they were when the Court rejected them. As the Court explained then, BIC's liability stems not from whether the expected useful life of the machines was announced publicly or represented directly to Plaintiffs, but from "BIC's expectations of its own product." *Maniscalco*, 627 F. Supp. 2d at 501. The Court also explained that the present case

---

[24] Although BIC contends that complete failure of their MFC machines as a result of the ME41 defect is not an ascertainable loss, most of BIC's argument is devoted to the false "ink empty" claims that Plaintiffs are no longer pursuing and, once again, BIC offers no argument at all regarding the ink-purging defect. *See id.* at 15-32.

---

is distinguishable from cases like *Perkins* because the allegedly defective component in *Perkins* had not failed (as it has here) and that the plaintiffs in *Perkins* did not allege that the defendant knew its product contained a defect that would cause it to fail before the end of its expected useful life (as Plaintiffs have here), and explained why the distinctions between *Perkins* and the present case are significant:

> Although a manufacturer or seller need not warrant that its product will survive for the useful life of the product, the present case is different because it deals with BIC's expectations of its own product. Indeed, Plaintiffs allege that BIC knew of the ME41 defect by 2001, knew that its product should last 5 years or 50,000 pages, limited the warranty coverage so that the MFC machines would last longer than the warranty period but that the machine head would not last as long as the product's expected useful life, and unconscionably marketed the product to uninformed consumers in order to maximize profits. These allegations taken as a whole are sufficient to constitute an unlawful act under the CFA.

*Id.* (footnote omitted).[25]

_____

[25] Other courts have recognized the significance of these distinctions as well. *See, e.g., Alban v. BMW of N. Am., LLC,* 2010 U.S. Dist. LEXIS 94038, *34-36 (D.N.J. Sept. 8, 2010) (discussing *Maniscalco*); *Luppino v. Mercedes-Benz USA, LLC,* 2010 U.S. Dist. LEXIS 83584, *21-24 (D.N.J. Aug. 13, 2010); *Henderson v. Volvo Cars of No. Am. LLC,* 2010 U.S. Dist. LEXIS 73624, *17-19 (D.N.J. July 21, 2010) (same); *Tucker v. Bernzomatic,* 2010 U.S. Dist. LEXIS 43771, *10-13 (E.D. Pa. May 4, 2010) (same); *Noble v. Porsche Cars N. Am., Inc.,* 694 F. Supp. 2d 333, 339 n. 4 (D.N.J. 2010) (same).

Plaintiffs also relied on *Payne v. Fujifilm U.S.A., Inc.,* 2007 U.S. Dist. LEXIS 94765 (D.N.J. Dec. 28, 2007), another decision in which a court rejected the notion that the expiration of a warranty could serve as a liability shield for a defendant who knew about, but did not disclose, what it knew about a product defect. But this Court found that *Payne*'s rationale was inapplicable, because Plaintiffs in this case had alleged that BIC's **concealment** which induced them to purchase the MFC machines was unconscionable, but had not alleged that the warranty **period** was unconscionable. *Maniscalco,* 627 F. Supp. 2d at 501 n. 3. Respectfully, Plaintiffs did make both allegations. *Compare* TAC ¶ 106 ("Plaintiffs allege that BIC's concealment and failure to disclose to Plaintiffs and the proposed class that the ME41 defect was likely to cause the print heads in MFC machines to fail prematurely (*i.e.,* before the end of the useful life that BIC

The Court also made a specific finding that, although the New Jersey courts had not addressed the specific situation before it, the New Jersey Supreme Court was unlikely to rule that the CFA does not apply to Plaintiffs' claims:

> If the New Jersey Supreme Court were faced with a situation where a manufacturer or seller of a product knew that its product had a defect which would cause it to fail before its expected useful life, and intentionally concealed that information from a purchaser, with the purpose of maximizing profit, I predict that the New Jersey Supreme Court would not be willing to find, as a matter of law, that the CFA was categorically inapplicable.

*Id.* at 502.

In the present motion, BIC cites no new authority (much less a ruling by the New Jersey Supreme Court) in support of its arguments, and it does not account for any aspect of—or even mention—the decision in which the Court rejected those arguments. Nor does BIC deny any of the facts that led to the Court's decision, because Plaintiffs have established each of them with indisputable evidence. *See generally* Section II.A., above. Instead, BIC attempts to resuscitate its argument that Plaintiffs' ME41 claims must be dismissed because BIC did not represent that the Affected Machines' useful life is 5 years or 50,000 pages by urging the Court to apply the ruling in *Arcand* to Plaintiffs' ME41 claims—even while acknowledging that *Arcand* involved an entirely different set of issues. *See* OB at 27 ("*Arcand* concerned toner-consumption issues rather than a duration-of-use issue").

---

determined to be five years or 50,000 pages of printed material) constitutes an unconscionable commercial practice in violation of N.J.S.A. § 56:8-2") *with id.* ¶ 107 ("Plaintiffs also allege that BIC's arbitrary limitation of warranty coverage for print heads that fail due to the ME41 defect, constitutes an unconscionable commercial practice in violation of N.J.S.A. § 56:8-2"). More important for the present purposes, Plaintiffs have substantiated both allegations with BIC's own documents and the testimony of its own personnel.

Distilled to its essence, the *Arcand* plaintiffs' claim was that BIC violated the CFA by affirmatively misrepresenting on the display of Brother laser printers and fax machines that the ink cartridges were "empty," but they did not allege that they received fewer pages than were specified in the user manual; rather, the plaintiffs alleged that they suffered an ascertainable loss when the false "empty" message was displayed and the machine prevented them from using the ink that remained in the cartridges. *Arcand*, 673 F. Supp. 2d at 298-303. The Court found that allowing such a claim to proceed would produce "a perplexing and anomalous result—providing legal redress for consumer fraud against a defendant who provides its consumers with a product that performs as exactly advertised in its user manual. Accordingly, the Court finds that Plaintiffs fail to plead an ascertainable loss and their NJCFA claim is dismissed." *Id.* at 303.

The claims in *Arcand* do not bear even a remote resemblance to **any** of the claims Plaintiffs have alleged in the present case. Moreover, unlike the plaintiffs in *Arcand*, Plaintiffs **have** established ascertainable loss in the present case: In exchange for what they paid for their MFC machines, Plaintiffs received products that were inordinately prone to print-head failure as a result of defects that became manifest after their warranty expired but before the end of their useful life, thereby rendering their machines utterly useless and forcing Plaintiffs to bear the cost of replacing them. Plaintiffs have thus established an ascertainable loss. *See, e.g., Lee v. Carter-Reed Co., L.L.C.*, 2010 N.J. LEXIS 951, *41 (N.J. Sept. 30, 2010) ("An ascertainable loss is a loss that is 'quantifiable or measurable'; it is not 'hypothetical or illusory. Examples of an ascertainable loss are an out-of-pocket loss and the replacement cost of a defective product") (citations omitted); *Arcand*, 673 F. Supp. 2d at 299-300.

The same is true with respect to Plaintiffs' ink-purging claims.[26]   As discussed in Section II.B., above, BIC was acutely aware that all the BHL2 machines (other than those specially made for use by hotels and a few others) were affected by the ink-purging defect, which caused them to purge substantial amounts of ink over *seven times* more frequently than non-defective machines. Response at 22-28, 41-44.   Plaintiffs both noticed that their BHL2 machines purged ink (or "self-cleaned") far more often than other printers and the ink cartridges seemed to become depleted of ink sooner than they should have, but they were unable to say precisely how many fewer pages they were able to print as a result. *Id.* at 25-28.

But BIC knew the answer to that question.   The user manuals that are packaged with the BHL2 machines state that the black print cartridges will yield approximately 500 pages at 5% coverage and that the three color cartridges will yield approximately 400 pages at 5% coverage.   *See id.* at 21.   BIC and BIL quantified the loss to consumers as a result of the ink-purging defect in several ways. Response at 41-44.   For example, to quantify the effect of the ink-purging defect in terms of page yields, BIC compared the performance of BHL2 machines that were identical except that one had the defect and the other did not. *Id.* ¶ 36 at 42-43.   The machines were left idle for six days, and by the end of the six-day test period BIC determined that, after just six days of use, "at 5% coverage, an[] additional 29 pages can be printed" using the machine with the modified software. *Id.*

---

[26] Once again, BIC has not addressed the ink-purging defect in its motion. Plaintiffs are explaining the basis for that claim solely for the benefit of the Court, and do not intend to waive BIC's error.

Moreover, in deposition Mr. Stadler admitted that if two otherwise identical BHL2 machines—again, one with the ink-purging defect and the other without— sat idle for six to seven months and were then subjected to heavy usage simultaneously, the ink cartridges in the defective machine would not come close to yielding even 250 pages, much less the 500 pages described in the user manual. *Id.* at 43-44.  Mr. Stadler also testified that the machine with the ink-purging defect would likely not yield *any* pages.  *Id.*  Conversely, Mr. Stadler stated that the ink cartridges in the non-defective machine would likely yield close to the 500 pages promised in the user manual.  *Id.* at 44.[27]  In short, BIC promised up to 400 to 500 pages at 5% coverage, but it has admitted—and BIC's testing and machine logs have shown—that the ink-purging defect prevents the ink cartridges in BHL2 machines from yielding anything close to that number of pages, unless a user prints without stopping until the cartridges are empty, or prints seven days a week.  Thus, Plaintiffs have suffered an ascertainable loss.

---

[27] Further confirmation that the ink-purging defect prevents BHL2 machines from yielding the promised 400 to 500 pages is the log in Mr. Maniscalco's machine.  According to the report that the machine generated from that log, Mr. Maniscalco's machine printed a total of 1,491 pages over its entire lifespan, during which he replaced the black and magenta cartridges nine times, the cyan cartridge eight times, and the yellow cartridge 11 times.  Disp. Facts ¶¶ 194-197.  Mr. Maniscalco's log report also shows that the modified software was *not* installed on his machine, meaning that it was affected by the ink-purging defect until the print head failed as a result of the ME41 defect.  *Id.*

BIC has stated that the ink-purging defect does not necessarily affect every machine that suffers from it.  For that to happen, however, the machine would have to be used for printing *every single day*.  *Id.* ¶¶ 243, 249-255.  When asked to identify even one customer who used their BHL2 machine in that manner, however, Mr. Stadler was unable to do so, and admitted that such usage would be very rare.  Response at 31.  Moreover, owners of BHL2 machines were never told that, to avoid the effects if the ink-purging defect, they had to print every single day.  Disp. Facts ¶ 243, 249-255.

### D.   BIC REPEATEDLY BREACHED ITS DUTY TO DISCLOSE TO DISCLOSE THE ME41 AND THE INK-PURGING DEFECTS

The final contention BIC makes in its motion is that it has not violated the CFA because it had no duty to disclose the ME41 defect or the ink-purging defect. OB at 36-40. BIC made the same argument when it moved to dismiss the ME41 claims, and the Court rejected it. *Maniscalco,* 627 F. Supp. 2d at 500-02. BIC has offered no new legal authority as ostensible support for this contention, because there is none. To the contrary, the text of the statute itself makes plain that the CFA makes it unlawful to engage in

> *the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission*, in connection with the sale or advertisement of any merchandise . . . , *whether or not any person has in fact been misled, deceived or damaged thereby* . . . .

N.J.S.A. § 56:8-2 (emphasis added).[28]

Plaintiffs submit that if the CFA makes it unlawful to intentionally omit, conceal, or suppress material facts, a necessary corollary is that the CFA imposes a duty to disclose those facts. If it did not, each of those aspects of the statute would be a nullity and the courts would be forced to ignore the legislative admonition that

---

[28] *See also Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 17 (1994) ("To violate the [CFA], a person must commit an "unlawful practice" as defined in the legislation. Unlawful practices fall into three general categories: affirmative acts, *knowing omissions*, and regulation violations") (emphasis added); *Strawn v. Canuso,* 140 N.J. 43, 65 (1995) (holding CFA imposed duty to disclose to prospective home buyers that homes' proximity to abandoned hazardous waste site, which was known to defendant "unknown and not readily observable by the buyer"); *Byrnes v. Billion BMW, Inc.,* 2008 WL 4131509, *10 (App. Div. 2008) ("An omission or failure to disclose a material fact, if accompanied by knowledge and intent, is sufficient to violate the CFA") (citing *Cox*); *Dewey v. Volkswagen AG,* 558 F. Supp. 2d 505, 526-527 (D.N.J. 2008) (denying motion to dismiss CFA based on defendant's failure to disclose design defects).

---

the CFA is to be construed liberally to fully effectuate its objectives.[29]

## IV.   CONCLUSION

If this case does not present a factual scenario in which forum law has the most significant relationship to the facts underlying the dispute, it is difficult to conceive of one that does.  And once the CFA is applied to Plaintiffs' claims, there is simply no question that they have suffered ascertainable losses and that BIC did, indeed, have a duty to disclose the existence, nature, and scope of the ME41 and ink-purging defects.  Accordingly, Plaintiffs respectfully submit that this motion should be denied.

DATED:  November 3, 2010              TURP, COATES, ESSL & DRIGGERS, P.C.


                                      by /s *Leonard J. Coates*
                                         Leonard J. Coates

                                      Attorneys for Plaintiffs
                                      Mark Maniscalco and Walter Huryk

---

[29] It was for these reasons that two Illinois courts rejected the same argument BIC makes here in connection with claims that arose under the Illinois Consumer Fraud Act, which also proscribes such omissions.  *See Celex Group v. Executive Gallery*, 877 F. Supp. 1114, 1129-1130 (N.D. Ill. 1995); *Totz v. Continental Du Page Acura*, 236 Ill. App. 3d 891, 901 (Ill. App. Ct. 2d Dist. 1992).  Nor do *Judge v. Blackfin Yacht Corp.*, 357 N.J. Super. 418 (App. Div. 2003), or *Adamson v. Ortho-McNeil Pharmaceutical, Inc.*, 463 F. Supp. 2d 496 (D.N.J. 2006), lead to a different result—anymore than they did the last time BIC relied on those cases: Neither case stands for the proposition that there is no duty to disclose under the CFA; rather, the rulings in both cases are based on findings that the facts in question were not material and ***that*** was why the defendant had no duty to disclose them.  *Judge*, 357 N.J. Super. at 427-28; *Adamson*, 463 F. Supp. 2d at 504.