**FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

|  |  |
|---|---|
| MARK MANISCALCO, <u>et al.</u>, | : |
| | : |
| Plaintiffs, | :    Civil Action No. 3:06-CV-04907(FLW) |
| v. | : |
| | :         OPINION |
| BROTHER INTERNATIONAL | : |
| CORPORATION (USA), | : |
| | : |
| Defendant. | : |

---

**WOLFSON, United States District Judge:**

Presently before the Court is a Motion for Summary Judgment by Defendant Brother International Corporation ("BIC" or "Defendant") as well as a Motion to Strike Portions of Defendant's Reply by Plaintiffs Mark Maniscalco ("Mr. Maniscalco") and Walter Huryk ("Mr. Huryk")(collectively "Plaintiffs"). The instant motions arise out of a Complaint by Plaintiffs on behalf of themselves, as well as a putative class of consumers, alleging defects relating to a line of Multi-Function Center ("MFC") machines distributed by BIC. Specifically, Plaintiffs contend that BIC concealed or failed to disclose two design defects present in the MFC machines and, as a result, that Plaintiffs are entitled to relief under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-2 ("NJCFA"). The alleged defects at issue are: (1) a defect that caused printer heads to fail and to display the message "Machine Error 41" ("ME41") before the end of their expected useful life; and (2) a defect that caused the MFC machines to purge excess amounts of ink.[1] For

---

[1]Importantly, in their opposition to the instant motion, Plaintiffs concede the dismissal of their "ink empty" claims; thus, the only claims that remain are those related to the alleged

the reasons that follow, the Court finds that the New Jersey Consumer Fraud Act ("NJCFA") does not apply to Plaintiffs' claims, and, therefore, the Court grants Defendant's motion for summary judgment and dismisses Plaintiffs' only remaining cause of action under the NJCFA.[2]

## I. FACTUAL BACKGROUND

BIC, a Delaware corporation with a principal place of business in New Jersey, is the distributor of MFC machines that are manufactured and designed by Brother Industries, Ltd. ("BIL"), BIC's parent entity in Japan.  The MFC machines at issue function as printers, fax machines, scanners and copiers.  BIC began distributing the relevant MFC machines – the Brother 3220C– in or around August or September 2001.[3]  Pls' Fact Statement ¶ 20.  Each MFC machine was accompanied by a Limited Warranty and a User Manual drafted by BIL.  Def's Fact Statement ¶ 4.

In relevant part, the Limited Warranty provided that each Brother 3220C would be "free

---

"Machine Error 41" ("ME41") defect and those that relate to the "ink-purging" defect.  Pl's Opp. at 3.

[2]In their motion to strike, Plaintiffs allege that BIC waived the right to move for summary judgment with regard to Plaintiffs' ink-purging claims because BIC included these arguments for the first time in its Reply Brief.  Because this Court is dismissing Plaintiffs' remaining claim on the grounds that New Jersey law does not apply, I need not reach the merits of Plaintiffs' Motion to Strike Portions of Defendants' Reply Brief.  Moreover, to the extent that this Opinion utilizes facts that are related to Plaintiffs' ink-purging claims including, for example, that BIC was not aware of the ink-purging defect until August 2004, these facts were included in Plaintiffs' Fact Statement and/or Responsive Fact Statement, thus Plaintiffs were clearly aware of their existence prior to the time that Defendant filed its Reply and they are therefore appropriate for this Court to consider as part of the instant choice of law analysis.

[3]Although additional MFC machines may be implicated by Plaintiffs' Complaint, as discussed infra, both named Plaintiffs purchased the Brother 3220C.

from defects in materials and workmanship, when used under normal conditions" for one year while any consumable and accessory items would be warranted for 90 days.  Def's Fact Statement ¶¶ 24, 108.  Under the Limited Warranty, BIC agreed to repair or replace the MFC machine or the relevant consumable or accessory item so long as the defect was reported to BIC or an authorized service center within the applicable warranty period.  Def's Fact Statement ¶¶ 25, 109; Pls' Resp. Fact Statement ¶¶ 25, 109.

In addition, the User Manual for the Brother 3220C machine provided specific information about the number of pages that a user could expect to print from a Brother brand cartridge when used in the MFC 3220C.  Specifically, at two distinct locations in the Manual, the user was advised that he should be able to print "up to 500 pages" from each Brother-brand black cartridge and "up to 400 pages" from each cyan, magenta or yellow cartridge.  Def's Fact Statement ¶ 20.  Moreover, the User Manual expressly stated that "[t]o ensure good print quality, the machine will regularly clean the print head."  McDonald Cert., Ex. 8 at 12-11.  In addition, in at least two distinct locations the Manual explained that the process of cleaning the print head consumes ink.  Specifically, on page 12-11, the Manual notes that "[c]leaning the print head consumes ink.  Cleaning too often uses ink unnecessarily," while in section S-8 the Manual states that  "the machine periodically cleans the print head to maintain print quality. This process consumes a small amount of ink."  Def's Fact Statement ¶ 22; McDonald Cert., Ex. 8 at 12-11, S-8.

A.     The Defects

i.     *ME41 Defect*

In or around late 2001, BIC began receiving calls regarding the appearance of an error message on certain MFC machines.  Pls' Fact Statement at ¶ 19.  The message, referred to as the ME41 error message or ME41 defect, indicated a voltage issue occurring within the print heads of affected machines.  Stadler Dep. 9:17-19.  Specifically, if the print head voltage failed to turn from low to high within a specified period of time, the affected machines would display the ME41 message and the machine would stop printing and would not resume printing until the message error was cleared.  Stadler Dep. 9:24-10:3, 10:24-11:1.  The ME41 message appeared regardless of whether the affected print head was temporarily or permanently out of order.  Pls' Fact Statement ¶ 3.  In instances when a print head ceased functioning temporarily, the error message could be cleared simply by rebooting the machine – i.e. unplugging the machine and turning it on again.  Stadler Dep. 10:4-6.  However, if the MFC print head had permanently ceased functioning, the print head would have to be replaced to resolve the ME41 message and defect.  Stadler Dep. 12:3-9.

In 2001, BIC received 19 calls regarding the ME41 message.  Pls' Fact Statement ¶ 19.  By June 2002, the ME41 message was being investigated by BIC technical support in New Jersey.  Pls' Fact Statement ¶ 21.   In August 2002, BIC knew that some customers "were having a Machine Error 41, which is related to the print head," but did not know the cause of the ME41 error since such an error "could be caused by many different things."  Stadler Dep. 141:3-8.

Thereafter, in August 2002, BIC submitted a fault report to BIL to "bring to the attention of BIL the quality issues or customer calls that [BIC was] receiving."  Pls' Fact Statement ¶ 23; Stadler Dep. 24:13-17.   Indeed, in an attempt to solve the ME41 issue, BIL began to investigate the error message and BIC  "provide[d] information to BIL and occasionally sen[t] [BIL] sample

machines."  Stadler Dep. 32:12-14.  In November 2002, while the ME41 investigation was

ongoing, BIL provided a "temporary troubleshooting guide" to BIC with potential solutions and

countermeasures that BIC field personnel could implement if they encountered the ME41 defect.

Stadler Dep. 61-64.

On March 13, 2003, BIC opened another Fault Report concerning ME41.  Pls' Fact

Statement ¶ 43.   In March 2003, the ME41 issue was the "number 1 quality issue on this

product."  Pls' Fact Statement ¶ 46.  On November 11, 2003, BIC opened another fault report for

ME41.  Pls' Fact Statement ¶ 48.  By December 2003, BIC knew that the ME41 issue was still

occurring and began to extend the warranty on affected machines to 18 months for the ME41

defect "and requested warranty reimbursement and a no-cost print head from BIL."  Pls' Fact

Statement at 49; Stadler Dep: 166:9-20.  In May 2004, BIL advised BIC that it knew the cause of

the ME41 defect but did not know how to fix it.  Pls' Fact Statement ¶ 56.

In December 2004, BIC acknowledged that there was a significant number of "unhappy"

customers to warrant the implementation of a procedure where a supervisor or manager could

authorize a repair at no cost.  Pls' Fact Statement ¶ 85.  In addition, BIC lowered the cost of

replacement print heads from $129.99 to $29.99 and $19.99.  Pls' Fact Statement ¶ 86.

In or around early 2005, BIL began to consider recalling the affected machines.  Pls' Fact

Statement ¶ 144.   Because of concerns about the public perception of a recall,  BIC attempted to

convince BIL not to have the recall.  Id. ¶¶  145,146.

Thereafter, in February 2005, BIC extended the print head warranty for ME41 defects to

24 months from the date of purchase.  Pls' Fact Statement ¶ 94. To inform purchasers of the

warranty extension,  BIC sent e-mail notice of the warranty extension to 50,718 registered

customers that were still within the 24 month extended warranty.  Id. ¶ 109.  In addition, in

March 2005, BIC mailed a postcard to between 40,000 and 56,000 registered customers who

were still within the 24 month extended warranty and for whom it did not have an e-mail address.

Id. ¶ 112.  However, BIC did not provide notice of the warranty extension to consumers who

were no longer within the warranty period.  Pls' Fact Statement ¶ 116.

BIL eventually discovered a permanent fix for the ME41 defect in June 2005 that

involved changing the applied voltage on the MFC from 120 to 95 volts.  Stadler Dep. 33:19-

36:25.  The voltage change, however,  was only incorporated into the production of new MFC

machines; if an existing MFC machine displayed the ME41 message, the only permanent fix for

the machine was to replace the print head.  Stadler Dep. 37:7-14.

ii.     *Ink-Purging Defect*

In addition to the ME41 defect, Plaintiffs contend that BIC failed to disclose the existence

of a software defect in some MFC machines that would cause the machines to purge excess

amounts of ink.  Pls' Fact Statement ¶ 190.  In or around August 2, 2004, BIC's New Zealand

counterpart opened a Fault Report to launch an investigation into the cause of the ink-purging

defect.  Pls' Resp. Fact Statement at ¶ 20.   The Fault Report noted that certain "machines are

purging ink too often and emptying all the ink cartridges within 7 months or less, but the

specifications found with the MFC 3220C service manual states that the ink should last 20

month[]s plus on color and 15 months based on purging only . . . worst cases have included the

machine cleaning the inks to the point of coming up empty without the End User printing a single

page."  Pls' Resp. Fact Statement ¶ 20; Pls' Ex. 30 at 2446593.   The Fault Report additionally

noted that the same Fault was found in BI Austria and BI Netherlands.   Pls' Ex. 30 at 2446593.

By September 2004, BIC knew the ink purging defect was affecting MFC machines. Pls'
Resp. Fact Statement ¶ 20.  Indeed, in September 2004, BIL introduced modified software
intended to address the ink-purging defect. Pls' Fact Statement ¶ 198.  Initially, BIC made this
software available to its authorized service centers to provide to customers who brought their
machines in for repair.  Pls' Statement of Facts 218.  In Mach 2005, BIC created a CD containing
the modified software that it provided to owners for self-installation.  Id.  In June 2005, BIC
posted the revised software to its website to ensure that machine owners could download and
install the software themselves.  Id. at 219.  BIC, however, did not reach out to machine owners
to notify them about the availability of the revised software; customers only learned of the
software when they contacted BIC about the defect.  Id. 220.


B.    Plaintiffs

i.    *Maniscalco*

Mr. Maniscalco, a California resident, purchased an MFC 3220C from Office Depot in
California on or around June 28, 2004.  Mr. Maniscalco paid $128.74 for the printer.  The
machine purchased by Mr. Maniscalco came with the Limited Warranty and User Manual
discussed above.  Def's Fact Statement ¶¶  24, 108.  Mr. Maniscalco testified that he purchased
the Brother-brand printer for three reasons: (1) that the Brother machine used separate cartridges
for each of the inks; (2) the price of the machine; and (3) that he recognized and trusted the
Brother brand.  Def's Fact Statement ¶¶ 8-11.  Importantly, however, Mr. Maniscalco testified
that prior to purchasing the MFC 3220C, he did not perform any internet research nor did he look

at any "catalogs or magazines or sales circulars" to learn about the machine.  Maniscalco Dep. 173:6-174:1.  Moreover, although Mr. Maniscalco believed that his MFC would last approximately seven years, he did not receive or review any statement from BIC regarding the expected life of the machine.  Def's Fact Statement ¶¶ 16, 17; Pls' Resp. Fact Statement ¶¶ 16, 17.

Mr. Maniscalco began using his MFC in June 2004.  Thereafter, on May 23, 2007, Mr. Maniscalco's machine stopped working and displayed the ME 41 Error; specifically, Mr. Maniscalco received a message that read "Machine Error 41, unplug machine, then call Brother."  Def's Fact Statement ¶ 48.  In total, Mr. Maniscalco used his MFC machine for nearly three years prior to receiving the ME41 message.   Maniscalco Dep. 91:9-24; 106:24-107:8; 227:14-228:23.  During that time period, Mr. Maniscalco did not submit any complaints or warranty claims to BIC concerning the machine, nor did he incur any repair costs for the printer.  Def's Fact Statement 33; Pls' Resp. Fact Statement ¶ 33.

On or about October 13, 2006, seven months before his machine suffered from the "Machine Error 41"defect, Mr. Maniscalco filed a Complaint against Defendants including, in relevant part, a claim for non-disclosure of the ME41 defect and a claim that his machine suffered from excessive ink purging. Pls' Fact Statement ¶¶ 196, 197; Pls' Third Amended Complaint ¶112.   As a result of BIC's failure to disclose the ME41 and ink-purging defects, Mr. Maniscalco alleges that he lost use of his MFC machine, that he had to purchase a replacement machine, and that he paid more for his MFC  machine than it was worth.  Def's Fact Statement ¶¶ 57, 70; Pls' Resp. Fact Statement ¶¶ 57, 70.

ii.    *Huryk*

Mr. Huryk, a South Carolina resident, purchased an MFC 3220C from Office Depot in South Carolina on December 11, 2003. Mr. Huryk paid approximately $125 for the machine. Def's Fact Statement ¶ 85.  Mr. Huryk's MFC machine came with the same Limited Warranty as was provided to Mr. Maniscalco.  Mr. Huryk testified that prior to purchasing the machine, he did not review any magazines, periodicals, sales advertisements or circulars, nor did he review any of BIC's marketing materials concerning the machine.  Huryk Dep. 124:2-14.  Indeed, it is undisputed that Mr. Huryk's expectation about the life of his MFC machine was not based upon any statements or information from BIC or BIL.  Def's Fact Statement ¶ 114.  Instead, based on Mr. Huryk's experience as an executive of Scott Printing Corporation, as well as his background and experience with office equipment, Mr. Huryk believed his MFC machine would last between five and seven years.  Huryk Dep. 206:17-207:9; Def's Fact Statement ¶ 113;  Pls' Resp. Fact Statement ¶ 113.

Mr. Huryk began using his MFC in December 2003.  In or around early 2007, Mr. Huryk's MFC machine displayed the ME41 Error.  Def's Fact Statement 133.  Subsequently, in late April 2007, approximately three years and four months after he purchased the Brother 3220C, it stopped working altogether.  Def's Fact Statement ¶¶ 118-119, 133; Huryk Dep. 139:22-140:4; Pls' Resp. Fact Statement ¶ 133.   Mr. Huryk testified that prior to his machine ceasing in April 2007, he received the ME41 message several times.  Indeed, Mr. Huryk averred that he received the error message for at least a month and a half but "[p]robably not more than three, four months in advance of the March date."  Huryk Dep. 141:3-4.  On or around April 24, 2007, Mr. Huryk became aware of this pending litigation, and one day later, on or around April

9

25, 2007, Mr. Huryk disconnected his machine and disposed of it by putting it on the curb.  Def's

Fact Statement ¶¶ 138, 140.  Thereafter, on or around April 26, 2007, Mr. Huryk purchased a HP

Office Jet 4315, an "all-in-one" or multi function device.  Def's Fact Statement ¶ 146; Pls' Resp.

Fact Statement ¶ 146.

In relevant part, in this lawsuit, Mr. Huryk alleges that as a result of Defendant's failure

to disclose the ME41 defect, his machine ceased functioning and he had to purchase a

replacement machine.  Id. ¶ 128.  In addition, Mr. Huryk contends that his machine suffered from

excess ink purging.  Pls' Br.  at 17.  As a result, Mr. Huryk additionally contends that he paid

more for his MFC machine than it was worth.

## II. PROCEDURAL HISTORY

In or around October 2006, Mr. Maniscalco filed a putative class action alleging, in

relevant part, that the MFC machine he purchased contained the following two defects: (1) a

defect that caused print heads to fail and to display the message "Machine Error 41" ("ME41")

before their expected useful life; and (2) a defect that caused the MFC machines to purge excess

amounts of ink.  Mr. Maniscalco  filed an Amended Complaint in October 2007 that, in relevant

part, named additional Plaintiffs including Mr. Huryk.  In July 2008, Plaintiffs filed a Third

Amended Complaint.  In September 2008, BIC filed a Motion to Dismiss, and, in June 2009, this

Court issued an Opinion granting BIC's motion with respect to Plaintiffs' claims for declaratory

judgment and unjust enrichment, but denying the motion to dismiss with respect to Plaintiffs'

claim for relief under the NJCFA.

Thereafter, in January 2011, BIC filed the instant Motion for Summary Judgment.  In this

motion,  BIC argues that summary judgment is warranted for two primary reasons: (1) the New Jersey Consumer Fraud Act does not apply to Plaintiffs' claims; and (2) even if the NJCFA applied, Plaintiffs have not demonstrated: (i) an ascertainable loss; (ii) a causal connection between the alleged wrongful conduct and alleged harm; and (iii) that BIC engaged in any wrongful conduct.  In February 2011, after the summary judgment motion was completely briefed, Plaintiffs filed a Motion to Strike Portions of Defendant's Reply.  Specifically, Plaintiffs allege that BIC waived the right to move for summary judgment with regard to Plaintiffs' ink-purging claims because BIC included these arguments for the first time in its Reply Brief.

## III. DISCUSSION

A. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law."  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).  For a fact to be material, it must have the ability to "affect

11

the outcome of the suit under governing law." Kaucher, 455 F.3d at 423. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the fact finder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363

(3d Cir. 1992).

B. NJCFA Claim

As discussed above, pursuant to the Opinion entered by this Court in June 2009, the only

count remaining in this matter seeks relief under the New Jersey Consumer Fraud Act, N.J.S.A. §

56:8-2.  Specifically, Plaintiffs contend that BIC concealed or failed to disclose the following two

design defects inherent in the MFC machines: (1) a defect that caused the print heads to fail and

that was manifest by the ME41 error message; and (2) a defect that caused the MFC machines to

purge excessive amounts of ink.   As a result of BIC's failure to disclose these defects, Plaintiffs

allege that they suffered harm compensable under the NJCFA.

Initially, BIC argues that New Jersey law does not apply to the claims asserted here, and

instead, that the laws of Plaintiffs' home states – California and South Carolina – should govern.

As a result, BIC argues that this Court should grant summary judgment in its favor and dismiss

Plaintiffs' remaining claim.  Thus, prior to determining the merits of Plaintiffs' claims, this Court

must perform a choice of law analysis to determine whether New Jersey law applies.

1. Choice of Law

A federal court sitting in diversity jurisdiction must apply the forum state's choice of law

rules.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Gen. Star Nat'l Ins.

Co. v. Liberty Mutual Ins. Co., 960 F.2d 377, 379 (3d Cir. 1992).  New Jersey has adopted the

"most significant relationship" test of the Restatement (Second) of Conflict of Laws.  P.V. v.

Camp Jaycee, 197 N.J. 132, 142-43 (2008).   New Jersey's most significant relationship test

consists of two prongs. The first prong of the analysis requires a court to examine the substance of the potentially applicable laws in order to determine if an actual conflict exists. Camp Jaycee, 197 N.J. at 143-44 (citing Lebegern v. Forman, 471 F.3d 424, 430 (3d Cir. 2006)). Where there is no actual conflict, the analysis ends and the court applies the law of the forum state. See In re Ford Motor Co., 110 F.3d 954, 965 (3d Cir.1997); Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615, 621 (2007). However, if the court finds that a conflict exists, the court must determine which jurisdiction has the "most significant relationship" to the claim. Camp Jaycee, 197 N.J. at 136.

 In the instant matter, the parties do not appear to dispute that an actual conflict of laws exists between the consumer protection laws of New Jersey, South Carolina and California. Pls' Br. at 19-20; Def's Br. at 5-7. And, indeed, there are substantial differences between the laws of the relevant state including, for example, that South Carolina does not permit statutory consumer fraud actions to proceed by way of a class action, S.C. Code Ann. § 39-5-140(a), and that California consumer protection laws only provide relief for a consumer who has purchased goods "primarily for personal, family or household purposes." California Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1760 et seq. Def's Br. at 5-6. Thus, in light of the differences between the laws of New Jersey, California and South Carolina – a finding that is not disputed by the parties – the Court must proceed to the second prong of the choice of law analysis.

 Under the second step of the analysis, this Court must determine which state has the "most significant relationship" to the claim at issue by weighing the factors set forth in the Restatement section that corresponds to Plaintiffs' cause of action. See, e.g., Nafar v. Hollywood Tanning Sys., 339 F. App'x 216, 220 (3d Cir. 2009) (citing Agostino v. Quest Diagnostic, Inc.,

14

256 F.R.D. 437, 463 (D.N.J. 2009)); Camp Jaycee, 197 N.J. at 143-44.  Because the Plaintiffs

assert a claim under the NJCFA, the Court applies the conflict of laws analysis of Section 148 for

claims sounding in fraud or misrepresentation.  Restatement (Second) of Conflict of Laws § 148

(1971); see also, e.g., Agostino, 256 F.R.D. at 462; see also Nafar, 339 F. App'x  at 221.  Section

148 provides:

> (1) When the plaintiff has suffered pecuniary harm on account of his reliance on
> the defendant's false representations and when the plaintiff's action in reliance
> took place in the state where the false representations were made and received, the
> local law of this state determines the rights and liabilities of the parties unless,
> with respect to the particular issue, some other state has a more significant
> relationship under the principles stated in § 6 to the occurrence and the parties, in
> which event the local law of the other state will be applied.

> (2) When the plaintiff's action in reliance took place in whole or in part in a state
> other than that where the false representations were made, the forum will consider
> such of the following contacts, among others, as may be present in the particular
> case in determining the state which, with respect to the particular issue, has the
> most significant relationship to the occurrence and the parties:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's
> representations,

> (b) the place where the plaintiff received the representations,

> (c) the place where the defendant made the representations,

> (d) the domicile, residence, nationality, place of incorporation and place of
> business of the parties,

> (e) the place where a tangible thing which is the subject of the transaction between
> the parties was situated at the time, and

> (f) the place where the plaintiff is to render performance under a contract which he
> has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148 (1971).

Importantly, the Restatement distinguishes between instances in which the alleged misrepresentations and a plaintiff's reliance took place in the same state and instances in which the misrepresentations and reliance occurred in different states.  Accordingly, in the former situation, the state in which both the misrepresentations and reliance occurred is presumed to have the "most significant relationship" to the litigation.  Restatement (Second) of Conflict of Laws § 148(1).  In the latter, a court must weigh the factors set forth in section 148(2) to determine which state has the greatest ties to the plaintiffs' fraud claims.  Id. § 148(2).

Thus, for example, in Agostino, 256 F.R.D. at 463, the court applied section 148(1) to consumer fraud claims arising out of an illegal billing scheme stemming from a company with headquarters in New Jersey.  Specifically, the court held that although the allegedly fraudulent bills may have emanated from New Jersey, the statements were intended to be read in each plaintiff's home state, and, therefore, that the alleged misrepresentations were made in each of those states.   Thus, in light of the "strong presumption under Section 148 that the consumer fraud law of each class plaintiff's home state should apply to" the relevant claims, the court applied section 148(1).  Id. at 463.

In contrast, in In re Mercedes-Benz TeleAid Contract Litigation, 257 F.R.D. 46 (D.N.J. 2009), the court applied Section 148(2) to consumer fraud claims arising out of a manufacturer's alleged failure to disclose information pertaining to the impending obsolescence of an emergency response system installed in plaintiffs' vehicles.  There, the court noted that all of the actions and misrepresentations were "planned and implemented" in New Jersey.  Id. at 66.  Specifically, the court noted that the team that "oversaw the marketing and promotion of [the emergency response system], coordinated with AT &T in anticipation of the discontinuation of analog service, and

was responsible for deciding that. . .subscribers would be charged approximately $1,000 to upgrade to digital equipment" was located in New Jersey.   Id.  Because the misrepresentations were made in New Jersey and relied upon in each plaintiff's home state, the court held that Restatement 148(1) was not applicable, and, instead, used section 148(2) as the starting point for the choice of law analysis.

In the instant matter, Plaintiffs argue that section 148(1) is not applicable because the relevant conduct – the alleged concealment of, or failure to disclose, alleged defects in the MFC machines – occurred in New Jersey and Plaintiffs' actions in reliance thereon occurred in their respective home states.   Specifically,  Plaintiffs contend that BIC personnel in New Jersey "conceived, planned, and orchestrated every act of non-disclosure and suppression of material facts that gave rise to this lawsuit." Pls' Br. at 27.   Thus, Plaintiffs argue that because the misrepresentations and reliance took place in different states, 148(1) does not apply and that the most significant relationship test requires the application of New Jersey law under Section 148(2).  In that regard, Plaintiffs point to the following actions by BIC concerning the ME41 defect: (1) BIC's continued advertising and sale of affected machines pending the discovery of a permanent fix; (2) BIC's decision to limit the print-head warranty; (3) BIC's attempt to persuade BIL not to recall the affected machines; (4) BIC's decision to limit the number of people to whom notice of the warranty was sent; (5) BIC's posting of "information about the extended warranty in a manner that was intended to make it difficult to find"; (6) "enacting numerous, unannounced programs" concerning the warranties and fixes for the alleged defects.  Pls' Br. at 27-28.  In addition, Plaintiffs point to the following actions concerning the ink-purging defect: (1) BIC's continued advertising and sale of affected machines; (2) "concealing the fact that the

ink-purging defect made it impossible" for affected machines to provide the page yields stated in the User Manuals; (3) delaying the posting of modified software to its website for nine months; (4) "disguising the purpose of the modified software"; (5) advising purchasers on the web and in owner manuals that the ink purging they experienced was normal.  Id. at 28.

Defendant, on the other hand, argues that under either Restatement Section 148(1) or 148(2), the laws of Plaintiffs' home states would apply to the instant fraud claims.  Specifically, Defendant argues that, because Plaintiffs' claims are based on omissions, i.e., BIC's alleged failure to disclose defects inherent in the MFC machines, to the extent that BIC failed to make such disclosures, such omissions would have been directed at Plaintiffs in their home states, i.e., where Plaintiffs purchased and used their MFC machines.  Thus, Defendant argues that 148(1) applies and requires the application of the law of Plaintiffs' home states.  In the alternative, Defendant argues, that even if this Court were to find that 148(2) applies, no actionable omissions were made in New Jersey and the remaining factors under 148(2) require the application of the law of Plaintiffs' home states.   Specifically, Defendant argues that: (1) the User Manuals were prepared by BIL in Japan and that BIC had no responsibility for the content of the Manuals; (2) the MFC machines were designed and manufactured by BIL in Japan; (3) the investigations of the ME41 message and ink-purging firmware bug were conducted in Japan; and (4) all countermeasures to rectify these errors came from Japan.  The Court agrees with Defendants.  Indeed, as discussed below, a thorough review of the entire factual record presented by the parties on this motion demonstrates that Plaintiffs' conclusions that the alleged omissions were made by BIC in New Jersey are without support, and that under the analysis set forth in the

18

Restatement, the laws of Plaintiffs' home states apply.[4]

Initially, to the extent that Defendant argues that 148(1) applies based on the court's analysis in Agostino, Def's Br. at 9-10, I find that the facts of Agostino are distinguishable from those before me.  Specifically, in Agostino the defendant intended that fraudulent bills be read by each plaintiff in his or her home state; unlike Agostino, the facts here do not concern the direct targeting of plaintiffs whose identities and addresses are known.[5]  Moreover, neither party has put forth any evidence to demonstrate that omissions were made by Defendant in Plaintiffs' home states.  Thus, the Court is not convinced that 148(1) applies in the instant matter.

Under 148(2), a Court must weigh various "contacts" between Plaintiffs' fraud claims and the relevant states to determine which state has the greatest ties to the claims.  Importantly, "the question here is not whether New Jersey has any interest in this matter at all; it is whether New Jersey has the most significant relationship with this dispute."  Nikolin v. Samsung Electronics America, Inc., Civ. A. No. 10-1456, 2010 WL 4116997, at *4 (D.N.J. Oct. 18, 2010); see also Camp Jaycee, 197 N.J. at 143; Arcand v. Brother Intern. Corp., 673 F. Supp. 2d 282, 293

---

[4]Importantly, the Court notes that unlike both Agostino and Mercedes, because this matter is presented on a motion for summary judgment, the Court is not relegated to considering mere allegations concerning BIC's omissions; instead, the Court has at its disposal the discovery provided by the parties, including numerous documents and deposition excerpts, through which I can determine the exact contours of the alleged omissions as well as the location at which they were made.

[5]In addition, the facts here are distinguishable from those in Mercedes.  There, the court determined that the relevant misrepresentations took place in New Jersey, and, therefore that section 148(2) demanded application of New Jersey law.  Despite Plaintiffs' suggestion that this matter requires the same analysis, i.e., that BIC made omissions in New Jersey which require the application of New Jersey law, as discussed infra, a thorough review of the extensive factual record reveals no omissions by BIC in New Jersey and, therefore, the analysis under 148(2) demonstrates that the law of Plaintiffs' respective home states should apply.

(D.N.J. 2009).

In that regard, the Court notes that because Plaintiffs received and relied upon BIC's alleged omissions in their home states, Plaintiffs concede that three of the six factors enumerated in 148(2) – (a) place of reliance; (b) place where plaintiff received the representation and (e) the place where a tangible thing which is the subject of the transaction is located – weigh in favor of applying the law of each Plaintiff's home state. Moreover, the Court finds that because the Plaintiffs reside in South Carolina and California, and BIC is headquartered in New Jersey and incorporated in Delaware, factor (d) – the domicile, residence and place of business or incorporation – does not favor any particular jurisdiction. In addition, factor (f) is inapplicable since there is no contract performance by Plaintiffs at issue here. Thus, the choice of law analysis under 148(2) turns largely on the application of factor (c) – the place where defendants made the misrepresentations.

Here, Plaintiffs argue that factor (c) weighs in favor of New Jersey law. Specifically, Plaintiffs contend that BIC is headquartered in New Jersey and New Jersey is the place wherein BIC personnel "conceived, planned, and orchestrated every act of non-disclosure and suppression of material facts that gave rise to this lawsuit." Pls' Br. at 27. Thus, Plaintiffs argue that New Jersey has the most significant relationship to this case. Pls' Br. at 27. Defendants, on the other hand, argue that "the only relevant connection" between Plaintiffs' fraud claims and New Jersey is the fact that BIC has headquarters in New Jersey, and that connection does not suffice; therefore, that the law of Plaintiffs' home states applies. Def's Reply at 5.

A majority of courts in this District have held that the mere fact that a company is headquartered in New Jersey will "not supersede the numerous contacts with the consumer's

home state" for purposes of determining which state has the most significant relationship under Restatement § 148(2).  Nikolin, 2010 WL 4116997, at *4; see also Cooper v. Samsung Electronics America, Inc., 374 Fed. App'x. 250, 255 (3d Cir. March 30, 2010) (upholding a District Court's refusal to apply the NJCFA where plaintiff, an Arizona resident, learned of, purchased and used a Samsung television in Arizona and where New Jersey's only connection to the matter was the fact that Samsung's headquarters were located in New Jersey).

Moreover, numerous courts in this District have held that even where a plaintiff has alleged that "unlawful conduct emanated from New Jersey," such contact does not "outweigh the substantial ties to plaintiff's' home states based on other factors under § 148(2)."  Nikolin, 2010 WL 4116997, at *4 (collecting cases).   For example, in Warma Witter Kreisler, Inc.v. Samsung Elecs. Am., Inc, the court held that an "allegation that [S]amsung designed the product's operation in New Jersey does not outweigh the other, more significant, ties to Illinois."  No. 08-5380, 2010 WL 1424014, at *4 (D.N.J. Apr. 8, 2010).  Similarly, in  Knox v. Samsung Electronics America, Inc., Civ. A. No. 08-4308, 2009 WL 1810728, at *4 (D.N.J. June 25, 2009), the court applied Georgia's consumer fraud law where "the consumer contacts . . . all occurred in Georgia" and noted that despite Samsung's headquarters and the alleged wrongdoing occurring in New Jersey, "it is not clear . . .that New Jersey intended out-of-state consumers to engage in end runs around local law in order to avail themselves of collective and class remedies that those states deny."  Id. Conversely, however, in Mercedes, 257 F.R.D. at 69, the court applied New Jersey law where "[t]he alleged misrepresentations which form the basis of Plaintiff's consumer fraud claim were made by the company's [team in New Jersey] which allegedly oversaw the promotion and marketing of Tele Aid, coordinated with AT&T relating to the discontinuation of

analog service, and decided that customers would be charged $1,000 to upgrade to digital equipment." Id.

To reconcile the apparent split amongst courts in this District in this context, this Court must consider the evidence of allegedly relevant omissions on the part of BIC, and, specifically whether BIC made any decision to conceal the ME41 or ink-purging defects in New Jersey. Initially, the Court notes that despite Plaintiffs' efforts to demonstrate that BIC, as opposed to the non-party BIL, failed to disclose certain defects and that those decisions emanated from New Jersey, Plaintiffs have not, in fact, pointed to a single decision by BIC to conceal the ME41 or ink-purging defects such that New Jersey, and not Plaintiffs' home states, would have the most significant relationship to Plaintiffs' fraud claims. Indeed, it is undisputed that the MFC machines were neither designed nor manufactured in New Jersey. Moreover, the User Manuals and Limited Warranty statements that accompanied the MFC machines were written by BIL in Japan. Def's Fact Statement ¶ 4. Thus, any representations set forth therein, and upon which Plaintiffs may have relied, were not made by BIC in New Jersey. Cummins Dep. 200:14-201:16; Pls' Disp. Fact Statement at 7-8.

In addition, the fact that BIC continued to sell the MFC machines while BIL investigated the underlying ME41 and ink-purging defects in Japan does not indicate an actionable omission or decision to conceal any defect by BIC in New Jersey. To be actionable under the NJCFA, an omission of any material fact must be made "with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate. . . ." N.J.S.A. §56:8-2. Here, Plaintiffs have not set forth any facts pointing to a decision to omit or conceal a material fact concerning the ME41 defect by BIC, and, indeed, the mere fact

that BIC continued to sell the MFC machines, neither indicates, nor establishes, any decision

whatsoever on the part of BIC.   See, e.g., Arcand, 673 F. Supp. 2d at 299 (holding that "for

liability to attach [under the NJCFA], the unlawful conduct must . . . relate to a seller's interest in

selling his merchandise, whether that be a face-to-face distortion of the nature of the product

between salesperson and in-store consumer, a contractor's gross exaggeration of his

qualifications to a prospective homeowner in need of renovations, or a more complicated scheme

as alleged here, where the seller packages its products with a mechanism that induces its buyers

to purchase another of its products to generate more revenue.").

Moreover, with regard to the specific defects at issue, the record is plain that while BIC

became aware of the ME41 defect in 2002, the defect did not affect the entire line of MFC

machines.  Pls' Resp. Fact Statement ¶¶ 62,63.  Further, the record indicates that although BIC

kept track of customer complaints concerning the ME41 defect, BIC did not investigate the cause

of the defect and, instead,  requested that BIL investigate the defect.  Pls' Fact Statement ¶ 23;

Stadler Dep. 24:13-32:12.  Indeed, it is undisputed that the investigation into the ME41 defect

was performed by BIL in Japan, id., and that BIL did not develop a permanent fix for the defect

until June 2005.  Stadler Dep. 33:19-36:25.  Further,  while the investigation into the ME41

defect was occurring, BIC decided to extend the warranty on the print heads from the initial 90

days or one year to 24 or 30 months.  Pls' Resp. Fact Statement ¶ 65.  In that regard, the Court

finds that BIC's decision to extend the warranty on the print heads – and any related decisions as

to how and where to announce such extensions – cannot be equated with a decision to conceal a

defect.  Finally, to the extent that Plaintiffs attempt to argue that BIC engaged in wrongful

conduct in New Jersey by attempting to persuade BIL not to recall the affected MFC machines,

the Court finds that, rather than bolstering its position that New Jersey law should apply, this argument supports the conclusion that, for the purposes of the choice of law analysis, the relevant decisions  concerning the MFC machines, including whether to recall them, were not made in New Jersey, but in Japan.

Similarly, with regard to the ink-purging defect of which BIC became aware sometime in or around August or September 2004[6], it is undisputed that the investigation into this defect was performed by BIL in Japan.  Moreover, the countermeasures or fixes for the ink-purging defect came from BIL in Japan.  Pls' Disp. Fact Statement ¶ 198.  Furthermore, although Plaintiffs are correct that BIC did not immediately make the modified software available on its website, Plaintiffs ignore the fact that BIC made the modified software available at its service centers "to use when . . . owners brought their . . . machines in for repair."  Pls' Fact Statement ¶ 218.  Moreover, in March 2005, BIC made the software available to its customers via a CD, and, in June 2005, BIC posted the software to its website so that owners could download it themselves.  Pls' Fact Statement ¶ 219.  Indeed, as with Plaintiffs' argument concerning the warranty extensions, BIC's decisions as to how and when to make the modified software available cannot be equated with an affirmative decision to conceal the ink-purging defect for purposes of this choice of law analysis.

Accordingly, in the absence of any evidence to support Plaintiffs' claim that BIC made a decision in New Jersey to conceal either the ME41 or ink-purging defects, the Court finds that the facts set forth in Restatement section 148(2) weigh in favor of applying the law of each of the

---

[6]Indeed, the record makes plain that BIC did not even become aware of the ink-purging defect until after Plaintiffs purchased their machines.  Pls' Resp. Fact Statement  ¶¶ 1,2, 20.

Plaintiff's home states.  Specifically, as discussed above, because each Plaintiff: (i) resides outside of New Jersey – in California and South Carolina respectively; (ii) purchased and used the MFC machines in their home states and; (iii) relied upon the allegedly deceptive conduct in their home states, the Court finds that California , in the case of Mr. Maniscalco, and South Carolina, in the case of Mr. Huryk, have the most significant relationships with this litigation. Moreover, even if I were to find that BIC had made a decision to conceal in New Jersey, such a finding would not alter my determination that California and South Carolina have the most significant relationship to Plaintiffs' fraud claims; indeed, as discussed above, a majority of the courts in this district have determined that unlawful conduct emanating from New Jersey does not necessarily "supersede the numerous contacts" a plaintiff had with his home state.  Nikolin, 2010 WL 4116997, at *4 (collecting cases).  Because Plaintiffs' only remaining cause of action in this matter is based on the NJCFA and the Court has determined that New Jersey law does not apply,  Plaintiffs' Complaint is dismissed.


**IV. CONCLUSION**

        For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED and Plaintiffs' claim under the NJCFA is DISMISSED.


Dated: June 24, 2011                          /s/ Freda L. Wolfson_____
                                              Freda L. Wolfson, U.S.D.J.